UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLOYD ALLEN HARDRICK, JR.,
BIANCA PETERSON, THERESA
ROBINSON, ROCHELLE MUNSON-GRIFFIN,
FREDERICK DOUGLAS WEEMS,
ROUSIA MAY, THOMASINA MCCONNELL,
VERONICA SEWARD, CHRISTIE NELSON,
KAITLYN MCNAY-COLLINS,
and ALICIA KATHLEEN NAPIER
on behalf of themselves and for the
benefit of all others similarly situated,

        Plaintiffs

                                        Case No. 2015-_____

v.

                                        Hon. _____

CITY OF DETROIT, DETROIT ANIMAL CONTROL,
DETROIT POLICE DEPARTMENT
and HARRY WARD,

        Defendants.

---

NEUMAN ANDERSON, P.C.
Jennifer M. Grieco (P55501)
Stephen T. McKenney (P65673)
Kenneth F. Neuman (P39429)
401 South Old Woodward Ave., Ste. 460
Birmingham, MI 48009
Phone: 248.594.5252
jgrieco@neumananderson.com
smckenney@neumananderson.com
Attorneys for Plaintiffs

---

**COMPLAINT AND JURY DEMAND**

Plaintiffs Floyd Allen Hardrick, Jr., Bianca Peterson, Theresa Robinson, Rochelle Munson-Griffin, Frederick Douglas Weems, Rousia May, Thomasina McConnell, Veronica Seward, Christie Nelson, Kaitlyn McNay-Collins and Alicia Kathleen Napier, for their complaint against defendants City of Detroit, Detroit Animal Control, Detroit Police Department and Harry Ward state:

### OVERVIEW OF THE CASE

1.     The City of Detroit and the Detroit Police Department operate the Detroit Animal Control under the direction and leadership of Harry Ward. Over the past several years Mr. Ward has used his authority as a state actor to (1) continuously and systematically seize dogs from their owners (in some instances breaking and entering private residences without a warrant); (2) imprison these dogs in filthy, brutal and deplorable conditions, which often cause the dogs to either die or develop irreversible health problems; and then (3) demand that the owners pay arbitrary "fines" and "fees" (always in cash – no other payment is allowed) to reclaim their dogs and to save them from the deadly and disgusting conditions maintained by the defendants.

2.     The defendants' conduct violates the plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and the plaintiffs seek, *inter alia*, injunctive relief and monetary damages under 42 U.S.C. § 1983, *et seq.*

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff Floyd Allen Hardrick, Jr. is an individual person who resides in Wayne County, Michigan.

4.      Plaintiff Bianca Peterson is an individual person who resides in Wayne County, Michigan.

5.      Plaintiff Theresa Robinson is an individual person who resides in Wayne County, Michigan.

6.      Plaintiff Rochelle Munson Griffin is an individual person who resides in Wayne County, Michigan.

7.      Plaintiff Frederick Douglas Weems is an individual person who resides in Wayne County, Michigan.

8.      Plaintiff Rousia May is an individual person who resides in Wayne County, Michigan.

9.      Plaintiff Thomasina McConnell is an individual person who resides in Wayne County, Michigan.

10.     Plaintiff Veronica Seward is an individual person who resides in Wayne County, Michigan.

11.     Plaintiff Christie Nelson is an individual person who resides in Wayne County, Michigan.

12.    Plaintiff Kaitlyn McNay-Collins is an individual person who resides in Wayne County, Michigan.

13.    Plaintiff Alicia Kathleen Napier is an individual person who resides in Wayne County, Michigan.

14.    Defendant City of Detroit (the "City") is a municipal subdivision of the State of Michigan, which is located in Wayne County, Michigan.

15.    Defendant Detroit Animal Control ("DAC") is, on information and belief, a department of City and therefore a political subdivision of the State of Michigan, located in Wayne County, Michigan.

16.    Defendant Detroit Police Department (the "Police Department") is, on information and belief, a department of City and therefore a political subdivision of the State of Michigan, located in Wayne County, Michigan.  At all times relevant herein, the Police Department was responsible to oversee and manage the DAC.

17.    Defendant Harry Ward is an individual.  Mr. Ward is the chief official of the DAC and is employed by the DAC, the Police Department and/or the City (collectively, the City, DAC, the Police Department and Mr. Ward are the "Defendants.").

18.    The plaintiffs seek relief in this case under 42 U.S.C. § 1983, *et seq*.

19.    Plaintiffs' other claims in this action, which do not arise under federal statutes, are so related to the federal statutory claims that they form the same case or controversy.

20.    The Defendants reside within this judicial district and a substantial part of the acts and omissions giving rise to this claim occurred in this judicial district.

## GENERAL ALLEGATIONS

21.    Plaintiffs incorporate all previous allegations herein by reference.

22.    Each of the following Plaintiffs had contact with the City and the DAC, under the supervision and direction of Harry Ward and the Police Department, which contact demonstrated the Defendants' custom and practice of violating the constitutional rights of its citizens and causing them to suffer damages and irreparable harm.

Floyd Allen Hardrick, Jr.

23.    Plaintiff Floyd Allen Hardrick Jr., ("Mr. Hardrick") resides at 6261 Plainview, in Detroit.  He owned three dogs at this residence: "Rocky", "Mama" and "Puppy".

24.    On July 13, 2015, while Mr. Hardrick was at work, "Mama" pushed a window screen and jumped out of the home on 6261 Plainview.  A neighbor or other witness called the Police Department and/or the DAC regarding an

escaped dog but there was no report that she attacked anyone or was otherwise vicious.

25.    According to neighbors who were home that day, after running in the neighborhood, Mama went back into Mr. Hardrick's home.  The DAC, without a search warrant, broke into and entered Mr. Hardrick's home.  Mama was eventually captured by the DAC in Mr. Hardrick's backyard and taken to the DAC shelter at 3511 Jefferson, Detroit, Michigan (the "Shelter").

26.    However, while in Mr. Hardrick's home, without a warrant or any consent from Mr. Hardrick, the DAC unlawfully searched his home and located Puppy who was in a crate in the basement.  Without a warrant, or any provocation or violation by Puppy, the DAC seized Puppy and took him to the Shelter.

27.    In addition, Mr. Hardrick's dog, Rocky, was properly restrained outside on a chain in the backyard, per his normal practice in the summer months. Mr. Hardrick provided Rocky with a large bucket of food and water. Although Rocky was not in violation or bothering anyone, the DAC removed Rocky from his chain, removed him from the backyard without a warrant and took him to the Shelter.

28.    Neither the DAC nor the Police Department ever contacted Mr. Hardrick to obtain his consent to enter his property and/or to seize his

6

animals.   Neither the DAC nor the Police Department obtained a search warrant to enter his home or yard to seize the dogs.

29.   The DAC and the Police Department did not leave any ticket indicating a violation had occurred with the dogs.  In addition, neither the DAC nor the Police Department left a notice or otherwise advised Mr. Hardrick as to where his dogs were taken.

30.   Mr. Hardrick came home on July 13, 2015 to find all three of his dogs, including Puppy, who was located in a crate in the basement, had been unlawfully removed from his home.  In addition, Mr. Hardrick's side door was unlocked when he returned home.  Neighbors advised Mr. Hardrick that they had witnessed DAC officers in his home.

31.   Mr. Hardrick contacted DAC and was advised that his three dogs were located at the Shelter.

32.   Mr. Hardrick was advised that he would have to pay $130 in cash per dog to retrieve his dogs although he was not informed as to the basis for these fees.  He was also never charged with any violation related to the three dogs.

33.   Mr. Hardrick did not have the cash necessary to retrieve his three dogs on July 13, 2015.  He was told that he only had until July 21, 2015 to pay the $390 or his dogs would no longer be at the Shelter.

34.    On July 17, 2015, Mr. Hardrick went to the DAC with $130, despite the fact that his dogs were illegally taken.  Mr. Hardrick was only able to afford to retrieve one of his dogs and made the difficult decision to retrieve Rocky.

35.    Mr. Hardrick was specifically told by DAC employees that he had until July 21 to retrieve the other two dogs and further, that even if he paid the $130 to release Puppy, Puppy would probably not survive because of the conditions of the Shelter.

36.    After paying $130 in cash to retrieve Rocky, Mr. Hardrick was taken to the cage at the back of the Shelter where Rocky was being held.

37.    Mr. Hardrick viewed deplorable conditions in the Shelter and the corresponding conditions of the dogs, some of whom looked like they were dying in their cages and/or had been abused.  Mr. Hardrick also observed several dogs with open patches of raw skin.

38.    Rocky was held in a cage that was too small for his size and Mr. Hardrick observed soggy food on the floor outside of the dogs' cages.  Rocky was thinner and would not eat at all, even after he was home and fed table food.

39.    Rocky was three-and-a-half years old and was otherwise healthy before he was illegally taken from Mr. Hardrick's backyard by the DAC. However, Rocky came home from the DAC with a severe case of "kennel

8

cough". Rocky was unable to bark at all and was coughing and spitting-up a white mucous/phlegm. He also had mucous continuously running from his nose and was drooling saliva.

40. Mr. Hardrick gave Rocky the Mucinex that the DAC provided to him for Rocky's cough at his release, but Rocky died at home on the morning of July 21, 2015.

41. Mr. Hardrick was never able to afford to retrieve Mama and Puppy who were, on information and belief, destroyed by Defendants.

Bianca Peterson

42. Bianca Peterson ("Ms. Peterson") resides at 16865 Wildemere in Detroit. Ms. Peterson owned a four year-old male pit bull/mix named "Rocco." Rocco was either kept securely inside of the home or in the backyard behind an eight foot tall fence that was padlocked.

43. On June 10, 2015, an AT&T worker requested access to her backyard where Rocco was housed in order to gain entrance to an alley. He was denied access by Ms. Peterson's nineteen year-old son and at no time went into the backyard.

44. On June 12, 2015, an AT&T manager came back to the home and again requested access to the backyard. He was again denied access by Ms. Peterson's nineteen year-old son. The manager later came back to the home

and stated that he had called the DAC because Rocco had bit an AT&T employee.

45.    Ms. Peterson met the DAC officers at her home and disputed the allegation that Rocco bit any employee because the AT&T personnel were not provided with access to the backyard.  The manager stated that a dog ran up and bit the employee when he was outside of this vehicle parked on the street.

46.    DAC employee, Officer Tamacie Crosby, ordered Ms. Peterson to surrender Rocco to the DAC.  In that Rocco remained securely in the backyard behind an eight foot high padlocked fence, Ms. Peterson disputed the allegation and refused to surrender Rocco.

47.    Ms. Peterson questioned Officer Crosby and learned that Officer Crosby had not spoken with the employee who was allegedly bit, had not spoken directly with the manger, had not received a description of the dog allegedly involved in the bite and had no evidence that Rocco actually bit this individual to complete any investigation necessary for the determination that Rocco was a "dangerous animal" pursuant to state and local law.  Accordingly, Ms. Peterson continued to refuse to surrender Rocco.

48.    Officer Crosby then threated Ms. Peterson and stated that if she did not surrender Rocco, Ms. Peterson would be required to pay a $500 fine and to

spend 90 days in jail for harboring a vicious animal.  Although Ms. Peterson could afford the fine, she could not afford to miss 90 days of work.

49.    At no time did Officer Crosby advise Ms. Peterson of the state law that permits an owner to take their animal to a licensed veterinarian for a ten-day hold period following a suspected bite in order to complete a rabies observation and/or to confine Rocco to her own residence for the observation period.

50.    At no time did Officer Crosby advise Ms. Peterson of her rights under Michigan's statutory scheme or the United States Constitution to due process before there can be a "dangerous animal determination."

51.    Reluctantly, believing that she had no other choice and with the threat of 90 days in jail, Ms. Peterson surrendered Rocco to the DAC.  Officer Crosby did not have a warrant nor did she issue any citation to Ms. Peterson before taking Rocco.

52.    Ms. Peterson visited Rocco at the Shelter and witnessed horrible conditions.  She was overwhelmed by the smell of feces, urine, mildew and dead animals.  Ms. Peterson was advised that Rocco would only be fed once a day and that he would not be let out of his cage at any point during his stay. She was advised that despite these conditions, the cage would only be cleaned once a day.

53.   On each visit to the Shelter, Ms. Peterson observed that Rocco's condition was becoming progressively worse.  He appeared sick and coughing. He had not been eating and began to exhibit white mucous coming from his eyes and nose.  When she inquired, she was advised that he had "kennel cough" and that while they had a veterinarian on staff, the veterinarian only monitored the conditions; she did not treat the animals.

54.   Ms. Peterson was able to retrieve Rocco following the ten-day hold on June 22, 2015.  She was required to pay $290 in fees before they would release Rocco.

55.   DAC provided Ms. Peterson with Mucinex to treat Rocco's "kennel cough" and to break up the fluids in his throat.

56.   Before being unlawfully seized by the DAC, Rocco was an extremely active dog.  When Ms. Peterson brought Rocco home, he would not move from the floor and did not bark.

57.   By June 23, 2015, Rocco stopped eating even the soft food that Ms. Peterson tried to feed him.

58.   On June 25, 2015, Ms. Peterson took Rocco to Veterinary Emergency Services for his "kennel cough."  After observation, Rocco was also diagnosed with pneumonia.  He was prescribed a myriad of medications for his coughing, wheezing, sneezing, loss of appetite, the mucous leaking from his

eyes, lethargy, and gagging-up white phlegm. Ms. Peterson was advised to bring Rocco back in if he did not improve with the medications.

59.    Rocco did not improve and continued to get worse. By June 29, 2015, he was breathing harder, as if he could not catch his breath. He would not stand on his own.

60.    Ms. Peterson took Rocco back to Veterinary Emergency Services where they placed him on oxygen. It was discovered that Rocco had a crushed trachea, possibly from the use of the catch pole, which was resulting in his labored breathing.

61.    Rocco was diagnosed with severe infectious tracheobronchitis, laryngeal paralysis, tracheal avulsion, heartworm disease, pneumonia and ARDS.    After spending approximately $1,500 in veterinary services, Ms. Peterson was not able to afford the necessary additional treatment. In light of the severity of his condition, it was recommended that Rocco be euthanized.

62.    Rocco was euthanized on June 29, 2015.

63.    At no point in time was Ms. Peterson ever provided a copy of any investigation or a report finding that Rocco actually bit this alleged AT&T employee.    At no point in time was Ms. Peterson and/or Rocco issued any citation or ticket. On June 22, 2015, Officer Crosby admitted that she never even spoke with the alleged victim.

13

Theresa Robinson

64.     Theresa Robinson ("Ms. Robinson") is a resident of Detroit, Michigan.  She was evicted from her apartment at 7813 Warwick on October 6, 2015, following a dispute with her landlord over the unit's conditions.  The property management company called the DAC at the time of the eviction because she owned two dogs: "Diamond" (six years old) and "Sparkles" (one-and-a-half years old).

65.     However, Ms. Robinson pulled up in her vehicle when DAC was at the apartment and stated that she could take her dogs.  The dogs had not been cited for any violations.  DAC refused to release the dogs to her despite her being present and able to take her dogs.

66.     Ms. Robison was handed a pamphlet and told to contact DAC.  When she contacted DAC, she was told that she would have to pay $130, per dog, in cash, to release them from the Shelter.  She was not issued a ticket for a violation at any point in time.   Because she had just been evicted and was moving into a new apartment, she did not have $260 in cash to retrieve her dogs that day.

67.     Ms. Robinson called almost daily to check on the status of the dogs and to question whether she would still need the $260 in cash to retrieve her

dogs especially because she was not cited with any violation. DAC never told her the basis for the charge of $130 per dog.

68.    On October 19, 2015, Ms. Robinson again called DAC to check on her dogs.  She was told, for the first time, that she should come to the Shelter, identify her dogs and put a hold on them since she still did not have the $260 in cash.

69.    When Ms. Robinson arrived at the Shelter on October 19, 2015, she was told that Diamond had died over the weekend.  She asked to see Diamond but was told that she had been taken in a van along with the other dogs that died over the weekend.  When she asked how she died, the employee indicated that she must have come in sick to the Shelter, which Ms. Robinson knew was absolutely untrue.

70.    Ms. Robinson's dogs were vaccinated yearly at the local pet store. They were house dogs and otherwise healthy and well-cared-for dogs before being unlawfully seized by the DAC.

71.    Ms. Robinson asked to see Sparkles and was taken back to her cage.  Fox2 News was actually filming at the Shelter at the time of her visit. However, the reporters were taken into a different area that was much cleaner than where Sparkles was being held.

72. The location of the Shelter where Sparkles was housed smelled awful and the DAC worker could barely speak because she was coughing so severely. Ms. Robinson could barely breathe when she was in this part of the Shelter.

73. The small cage that Sparkles was held in was filthy and food and feces/urine were located on the same floor. Sparkles did not appear to be well.

74. Both on and off the news-camera, Ms. Robinson indicated that she was not leaving Sparkles in that facility considering that her other dog has clearly died from the deplorable conditions. Although she had been told for weeks that she had to come up with $260 in cash to retrieve Diamond and Sparkles, Ms. Robinson was asked by a DAC employee if she at least had $15 in cash for the dog license.

75. Ms. Robinson paid the $15 and was permitted to take Sparkles home as a result of her insistence that she would not leave and would continue to cause a scene while the media was present.

76. Sparkles left the Shelter with "kennel cough." She also had a brown thick substance on her nose that took days to improve. Ms. Robinson was given a prescription by DAC of four doses of Mucinex.

77. Sparkles' breathing was so labored, as documented on video, that Ms. Robinson stayed home from work with her for two days because she did

not know if she would survive.  Ms. Robinson continues to monitor Sparkles'
condition.

### Rochelle Munson-Griffin

78.    Rochelle  Munson-Griffin  ("Ms.  Munson-Griffin")  is  a  Detroit
resident who resided at 2000 Canterbury Road along with her American pit-
bull named "Meijer" that she owned for eleven years.  Meijer was a house dog,
in good health and kept current with his vaccinations.

79.    On November 13, 2014 at approximately 11:00 a.m., Meijer was let
out in the back yard and caught and killed a raccoon.  He did not appear to be
scratched or injured and was not otherwise bleeding but Ms. Munson-Griffin
thought she was doing the right thing by taking Meijer to the Shelter for a
rabies shot.

80.    However, rather than administering a simple rabies shot, the DAC
officers advised her that they would have to keep Meijer for 10 days for a
rabies quarantine.  Ms. Munson-Griffin was upset and did not want to leave
Meijer at the Shelter.  At no time did the DAC officers advise Ms. Munson-
Griffin that state law permits an owner to take their animal to a licensed
veterinarian for a ten-day rabies observation period and/or to confine Meijer
to her own residence for the observation period. Believing that she had no
choice, Ms. Munson-Griffin left Meijer at the Shelter.

81.    DAC went to Ms. Munson-Griffin's home to pick up the dead raccoon.  Not surprisingly, the raccoon was later determined not to have rabie, because rabid raccoon babies have not been detected in Michigan according to the State Department of Agriculture.

82.    Ms. Munson-Griffin visited Meijer at the Shelter.   Meijer was housed in a cage that was too small for his size and was at the end of row of dogs, many of whom looked sick.  He barked profusely at the DAC officer who stood next to Ms. Munson-Griffin with a catch pole.

83.    Ms. Munson-Griffin, who had visited the Shelter several years earlier with Meijer, immediately observed that the conditions of the Shelter were surprisingly poor and had deteriorated in the years since Meijer's first experiences at the Shelter.  Ms. Munson-Griffin observed that ceiling panels were missing throughout the facility and she was told by a DAC employee that DAC was treating for rats and that accounted for the scurrying sound that she heard overhead.

84.    Ms. Munson-Griffin was able to retrieve Meijer on November 24, 2014.  She was forced to pay $290 in cash for a license, rabies vaccination and "impound fees" before DAC would release Meijer even though she voluntarily brought him to the Shelter for the rabies vaccination.

85.   Meijer was skinnier, having lost almost 1/3 of his body weight.  He was so dirty that his coat was grey and his hair was falling off.  He was lethargic and would not move around and would not eat, even if fed by hand. He threw up the food he did eat.

86.   Meijer left the DAC with a significant cough, i.e., "kennel cough." He was hardly barking, even at visitors to the home, which was completely out of his character.  When he was able to bark, he could only make a raspy sound.

87.   On November 26, 2014, Meijer began to tremor and shake like he was having a stroke.  He would not move at all.  Ms. Munson-Griffin contacted BluePearl Veterinary Partners-Southfield ("BluePearl") and was advised to bring him into the vet if he did not improve.

88.   By November 28, 2014, the Friday after Thanksgiving, Meijer began to have difficulty breathing and had white mucous coming out of his nose and his eyes.  He would not eat soft food.  He was taken to BluePearl where he was placed on oxygen.

89.   At BluePearl, Ms. Munson-Griffin was advised that Meijer's body was in total shock.  His paws were swollen from what appeared to be torn ligaments and his body temperature dropped.  He was unable to breathe on his own.  The veterinarians at BluePearl indicated that he suffering and because of

his age, they recommended euthanasia.  After spending almost $4,000 in veterinarian bills, Ms. Munson-Griffin agreed with the recommendation.

90.    When Meijer was voluntarily taken to the Shelter for a rabies vaccination on November 13, 2014, he weighed approximately 125 lbs.  When Meijer was euthanized on November 30, 2014, he weighed only 67 pounds.

91.    Ms. Munson-Griffin obtained a necropsy report from Michigan State University.  The findings on necropsy include, but are not limited to, pneumonia due to canine adenovirus 2 type infection; positive *E. coli* and *Beta Hemolytic group C Streptococcus* from his respiratory culture; serosal hemorrhage at his trachea; severe necrotizing cellulitis and myositis over the left forelimb; mild left ventricular myocardial degeneration and myocarditis; bacterial colonization in this liver, kidney, spleen, lymph node and adrenal glands.

Frederick Douglass Weems

92.    Frederick Douglass Weems ("Mr. Weems") is a resident of the City of Detroit who previously resided at 16560 Beaverland where he was renting a room with his dog: "Scrappy".  Unbeknownst to Mr. Weems, the home was actually owned by Detroit Land Bank.

93.    On September 24, 2015, while he was at work, Mr. Weems received a call from a neighbor indicating that the Detroit Land Bank was at

the home with a large truck as well as the Police Department and DAC. Apparently, the owner of the home, from whom he sub-leased his room, was being evicted. Mr. Weems left work to go to his home on Beaverland, but was not able to get there before his belongings and Scrappy were gone.

94. On September 28, 2015, Mr. Weems went to the Shelter to inquire if DAC had Scrappy.

95. Mr. Weems was originally told that he would have to pay $130 in cash to retrieve Scrappy and that said charges were for a dog license, vaccination and "eviction removal fees". Mr. Weems did not have this amount in cash at the time. He was advised that he would have to pay an additional $10 per day for Scrappy to remain at the Shelter.

96. Mr. Weems anticipated getting paid on October 23 and intended to bring in the funds to retrieve Scrappy, which he believed would now be a total of $300 with the additional fees.

97. On October 19, 2015, Mr. Weems received a call that Scrappy died on October 15. When questioned, the DAC employee would not state how Scrappy died or why DAC waited four days to advise Mr. Weems that Scrappy had died. Mr. Weems was never permitted to see Scrappy's body to confirm that Scrappy actually died at the Shelter.

Rousia May

98.    Rousia May ("Ms. May") is 55 years old and resides at 19384 Strasburg, Detroit.  She owned two dogs: "Pretty Mama" and "Brick".  Brick was a full-bred boxer that Ms. May's son and his ex-girlfriend purchased for $2,300 from a pet store at the Macomb Mall.

99.    Ms. May's son and his girlfriend decided they could not care for Brick and gave him to Ms. May when Brick was six months old.  Ms. May owned Brick for over two years, having him licensed and vaccinated in her name in Harper Woods.

100.   In early June, 2015, Pretty Mama and Brick were sitting with Ms. May on the front porch of Ms. May's home.  The dogs ran off down the street and Ms. May chased after them.  When Brick crossed Seven Mile Road, she commanded that Pretty Mama "stay" so that she could retrieve Brick from across the street.

101.   When she quickly returned to where Pretty Mama had been sitting, she saw that a truck with animal crates had pulled up and two individuals were picking up Pretty Mama.  She thought they were "assisting" her with her dogs. She actually thanked them for their help with Pretty Mama and lifted Brick to put him on the truck, believing they would be dropped off at her home.  She advised them that she lived two blocks away.

22

102.   The individuals failed to advise her that they were not assisting her with her dogs.   In fact, they did not say anything to her.  Rather, the truck drove off with her dogs with no explanation of who they were or where they were going.  She was not provided with a ticket or notice of violation of any kind nor was she provided with any information as to where her dogs were being taken.

103.   Ms. May began to make calls to find out where her dogs were located.  She was eventually advised to contact DAC.

104.   On or about June 4, 2015, Ms. May went to the Shelter and located Brick in a pen with one other dog and Pretty Mama in a pen with six other dogs.  The DAC employees at the Shelter indicated that Ms. May would have to pay $130, per dog, in cash, for their release.  She was not issued a notice of violation or ticket of any kind.

105.   Ms. May obtained the money to release both dogs but DAC would only release Pretty Mama.   The DAC employees stated that they would not release Brick because he had a microchip inserted at Macomb Mall that was registered to the previous owner, the ex-girlfriend of Ms. May's son.

106.  Ms. May took Pretty Mama home and went back to DAC with evidence demonstrating that she was now Brick's owner including two receipts from the Center Line Veterinary Hospital for Brick's vaccinations in

2013, proof of Brick's 2014 Harper Woods dog license in her name, as well as a cancelled check and a vaccination reminder notice from Center Line Veterinary Hospital mailed to her attention for Brick.

107.   Despite this evidence, DAC refused to release Brick to Ms. May, allegedly because of a three year-old microchip.

108.   Ms. May routinely called DAC to check on Brick and ask that he be taken care of while this issue was resolved.  Ms. May's son had moved out of Michigan but came back to assist in obtaining Brick's release from the Shelter. Ms. May's son obtained a signed release from his ex-girlfriend stating that Ms. May was Brick's owner.

109.   After receiving the release, Ms. May contacted DAC to advise that she would be picking up Brick that day.

110.   Despite the repeated calls and the assurances that Brick would be taken care of, when they arrived at the Shelter with the letter signed by the ex-girlfriend, Ms. May and her son were advised that Brick had died the day before.  No one had contacted Ms. May to let her know Brick had died either in the time following his death or when Ms. May called to indicate that she would be picking him up.

111.   Ms. May did not see Brick's body or any proof that he actually died.

112.   Brick was unlawfully seized by DAC in the presence of Ms. May. Ms. May was not charged with any violation and she was never issued a ticket or provided with a warrant for Brick's seizure.

Thomasina McConnell

113.   Thomasina McConnell ("Ms. McConnell") is a resident of Detroit who resides at 18988 Woodbine.  She owned a dog named "Bam", a pit bull mix.  Bam was raised with four children in the household, the youngest of whom was just six years old when Ms. McConnell brought him home as a puppy.  Bam never showed any signs of aggression.

114.   On July 9, 2015, Ms. McConnell was at work and received a call from her seventeen year-old daughter that Bam escaped out of the house.  Ms. McConnell's daughter was following him on the sidewalk and he was never out of her sight.  Ms. McConnell's daughter was pregnant and therefore was unable to pick up the dog but she talked with Ms. McConnell on the phone as she followed Bam until she was able to coax him back to the house.

115.  When Ms. McConnell arrived home, two Police Department vehicles and four officers appeared at the house and stated that they had to take Bam for rabies quarantine because he allegedly bit a neighbor's child.  Ms. McConnell disputed this allegation because Bam never left her daughter's sight and did not bite any child when he was in her daughter's presence.

25

116.   Because the officers were unable to transport Bam without using a catch-pole, Ms. McConnell was ordered to drive Bam to the Shelter while being escorted by the two Police Department squad cars.  She complied, believing that she had no choice.

117.   Ms. McConnell was not advised that, pursuant to Michigan law, she was permitted to have her dogs quarantined for the ten-day rabies observation period following a suspected bite, at home or with a veterinarian of her choice.

118.   At no time did any of the Defendants or their agents advise Ms. McConnell of her rights under Michigan's statutory scheme or the United States Constitution to due process before there can be a "dangerous animal determination."

119.   At the Shelter, Ms. McConnell witnessed the animal control officers drag a stressed and terrified Bam on a catch pole.   In fact, the DAC officers advised Ms. McConnell that she should have Bam euthanized in order to avoid attorney fees and criminal charges.

120.  Ms. McConnell was provided a single half-page form that was entitled "Report of Animal Bite."   The form stated that she must return to pick up Bam on July 19 and that if she failed to do so within 48-hours, Bam would be euthanized.

121.   Although the ten-day hold period had expired, on July 20, 2015, Ms. McConnell received a call from Officer Tamacie Crosby at DAC advising her that the mother of the child who was allegedly bit wanted the dog put down.

122.   At that time, DAC had not issued a citation for any violation nor had there been a hearing or any finding that Bam was a "dangerous animal" and/or actually even bit the child in question.

123.   Officer Crosby threatened Ms. McConnell with a court appearance, jail time and fines if she refused to agree to have Bam euthanized.  Unable to afford jail time as a single mother with four children and believing that she had no choice, Ms. McConnell agree to have Bam euthanized.

124.   However, after speaking with an animal rights advocate, Ms. McConnell contacted Officer Crosby on July 22, 2015, to advise her that she had changed her mind and wanted to exercise her rights to have a hearing.  Ms. McConnell continued to dispute that Bam had actually bit the child, especially since her daughter was with him the entire time that he was out of the home.

125.   Ms. McConnell was then ordered by Officer Crosby to appear at the Shelter within the hour and was served with three tickets for failure to have a dog license, having a dog off of a leash and harboring a vicious dog.  She was required to attend a number of preliminary hearings in the 36th District Court, which caused her to lose her employment.

27

126.   During this time, Bam remained in the Shelter.   Ms. McConnell visited Bam on July 23 and observed that Bam's health appeared to be declining.   Bam lost one-third of his body weight and had developed a severe case of "kennel cough."

127.   Bam showed the following signs of abuse: (a) his paws were bleeding; (b) he had blood-red eyes from the use of the catch pole; and (c) he was soaking wet.   A DAC employee advised Ms. McConnell that Bam's cage was sprayed with him in it because Bam struggled too much on the catch pole to actually remove him for cleaning.

128.   As a result of his declining health, Ms. McConnell was forced to hire a lawyer and seek injunctive relief to have Bam released to the care of a veterinarian.

129.   The prosecutor eventually agreed to release Bam to a veterinarian and on July 30, 2015, Ms. McConnell and the City entered into a stipulation to have Bam transferred to the Groesbeck Animal Hospital.

130.   However, at the Groesbeck Animal Hospital, Bam did not recover. He no longer liked to be touched; he was skittish of noises and aggressive towards strangers.   He would not eat food out of bowls. He was not the same dog after leaving the Shelter and would no longer be able to live with children or other animals.

131.   Accordingly, after spending less than one month in the Shelter and after spending over $4,000 in veterinarian fees, Bam was euthanized on August 26, 2015 because of his declining health and illness.

132.   As a result of the conditions at the Shelter, Ms. McConnell was never able to bring Bam home, although there never was any finding that Bam was "vicious" or "dangerous" or even a determination as to whether Bam had actually bit the child in question.

Veronica Seward

133.   Veronica Seward ("Ms. Seward") resides at 20467 Kentucky St., in Detroit.  In June of 2015, she resided at the home with her family and her three dogs, including her dog: "Major", an almost two year-old American Bulldog.

134.   On June 25, 2015, a neighbor child came to house to return an item.  This particular child had been told in the past to stop peeping in the windows of the Seward home because he agitated the dogs.

135.   On this date, after he returned the item, he looked at Major and started running.  Major ran after him and Ms. Seward ran after Major.  The child fell on the driveway and Major scratched the child with his paw.  He was not snarling or growling nor did he show his teeth.  Ms. Seward did not witness Major bite the child.

136.   Neighbors who were outside started screaming, which caused Major to run off towards their house.  Ms. Seward chased after him and pulled him home.  Ms. Seward did not see Major bite any neighbor.

137.   The Police Department came to the Seward home and stated that DAC would be coming to pick up Major.

138.   On Monday, June 29, 2015, employees from DAC came to pick up Major.  Ms. Seward complied.

139.   Ms. Seward visited Major at the Shelter on June 29, 2015.  Major was being held in a cage that was too small for him.  He was unable to fully extend his legs or neck and head.  She noticed that a dog next to him had white mucous coming out of his nose and eyes.

140.   On July 1, 2015, while visiting Major, DAC Officer Crosby asked Ms. Seward if she was willing to turn Major over to the City of Detroit for euthanasia.  Ms. Seward did not want Major killed.

141.   At no time did Officer Crosby advise Ms. Seward of the state law that permits an owner to take their animal to a licensed veterinarian for a ten-day hold period following a suspected bite in order to complete a rabies observation and/or to confine Major to her own residence for the observation period.

142.  At no time did Officer Crosby advise Ms. Seward of her rights under Michigan's statutory scheme or the United States Constitution to due process before there can be a "dangerous animal determination."

143.  At that time, when Officer Crosby requested that Ms. Seward agree to euthanasia, Ms. Seward had not been issued any tickets, nor had there been a dangerous animal determination or even an investigation into the bite incident.

144.  The Shelter was closed over the Fourth of July holiday and Ms. Seward went to visit Major on Monday, July 6.  After she signed in, Officer Rhodes of DAC indicated that the ten-day hold period had expired and she could take Major home.  However, since the veterinarian was not on site to issue his rabies vaccination, she would have to come back on Tuesday, July 7 to pick up Major.

145.  On July 7, Ms. Seward went to pick up Major at the DAC.  He was released after being given a rabies shot and after Ms. Seward paid $290 in cash.

146.  On Wednesday, July 8, Officer Crosby from the DAC and officers from the Police Department appeared at the Seward home and demanded Major's return to the Shelter.  Officer Crosby stated that she had advised Ms. Seward that she was not able to bring him home and that her option was euthanasia or to await a judge's determination.  However, as this point, Ms.

31

Seward had not been issued any tickets and DAC permitted her to take Major home after paying $290.  Ms. Seward initially refused to release Major.

147.  Officer Crosby and the Police Department officers advised Ms. Seward that if she did not release Major, they would put her in hand-cuffs in front of her children and take her to jail.

148.  Ms. Seward was therefore forced to place Major on the DAC truck and he was placed in a cage with urine and hair from the prior dog.  Officer Crosby then, for the first time, issued four tickets to Ms. Seward for harboring a vicious animal, failure to have dog licenses and dog-at-large.

149.  Ms. Seward visited Major the next day.  She also went back to visit him on Friday, July 10.  She found him in his cage with dried blood on his anus and blood running down his cage.  She demanded that the veterinarian examine Major.

150.  Dr. Berkley came to inspect Major and stated that it "smelled like parvo."

151.  Dr. Berkley and/or DAC agreed to have Major temporarily transferred to the Harper Woods Emergency Veterinary Hospital under emergency circumstances and only until his condition improved.  Major was admitted on Friday, July 10, 2015.

152. Harper Woods Emergency Veterinary Hospital administered IV fluids and attempted to kill the infection however, the staff was unsuccessful. By Saturday, July 11, Major was bleeding from his eyes. Ms. Seward was advised that Major's systems were shutting down. He died later that evening.

153. Ms. Seward sent Major to Michigan State University for a necropsy report. The findings were that Major was an otherwise healthy dog with gross lesions suggestive of canine parvovirus infection.

154. No investigation was ever performed by Officer Crosby to confirm or deny the bite allegations. The tickets for harboring a vicious animal and dog at large were dismissed.

155. Ms. Seward demanded her money back from DAC because she paid for Major's return and DAC seized him again the next day. The City sent the check along with a release which required Ms. Seward to release the City, the Police Department, DAC and its employees from any action of any kind involving Major's quarantine from June 29 through July 6 at the Shelter and his additional impound on July 8, 2015. Ms. Seward refused to cash the check or sign the release.

Christie Nelson

156. Christie Nelson ("Ms. Nelson") resides at 8449 Gartner in Detroit. She is a mother of 6 children and owns three dogs at the address.

157.   On July 17, 2015, Ms. Nelson was in the process of bathing her dogs outside.  Her dog, Chunk, a five year-old American Bulldog mix, had just been washed and was sitting on the front porch with her four year-old son.  Her four year-old had pushed open the gate to the yard and Chunk was drinking water that had accumulated from the hose used to bathe the dogs.

158.   Ms. Nelson heard someone yell "go back into the yard" and went to the front yard to see who made the statement.  She saw Chunk and told Chunk to go inside, which Chunk did.

159.   An officer from DAC was standing at her yard with a catch pole and stated that he needed to take her dog down to the Shelter.  When she asked why, he indicated that someone had called the Police Department to indicate that a dog was running loose, chasing people in the neighborhood.  The DAC officer stated that her dog was out of her yard.

160.   Ms. Nelson knew that she had just bathed Chunk and that he had not left the yard that day, other than to drink some water on the sidewalk located directly in front of her yard.  Chunk was also sitting inside the house so Ms. Nelson objected to the DAC officer taking Chunk.

161.  The DAC officer then asked how many dogs she had and she indicated that she had two other dogs inside.  The DAC officer stated that if she would turn over Chunk, he would not take her other two dogs as well.  He also

stated that if she refused, the Police Department would be called. Not wanting her other dogs to be taken or for the Police Department to arrive, she took Chunk out of her house and handed her to the DAC officer.

162. Ms. Nelson asked what would happen to Chunk and they stated that she could come retrieve her at the Shelter and pay the required fees. Ms. Nelson was not certain that she could afford the fees and asked what would happen to her if she could not pay. She was advised that Chunk would be euthanized.

163. Ms. Nelson was able to gather the $130 necessary that day to retrieve Chunk from DAC. She called DAC and asked when Chunk could be picked up. A DAC employee told Ms. Nelson that as long as she arrived by 3:30, she could pay the fine and take Chunk home.

164. Ms. Nelson arrived at the Shelter at 3:28 p.m., just as an employee was about to turn the sign to "closed". Ms. Nelson was told that the Shelter was now closed and she could not retrieve Chunk.

165. Ms. Nelson was not able to retrieve Chunk on Saturday, July 18. Accordingly, Chunk was released on Monday, July 20, 2015 with the payment of $130 in cash.

166. After returning home, Chunk appeared to be fine at first. But within a couple days, she began to exhibit signs of "kennel cough" and stopped

eating.  Chunk was taken to the Pet Care Clinic on Southfield Road in Lincoln Park on July 27, 2015.  Chunk required fluids, injections, prednisone and cough tablets.

167.  Chunk was taken back to the Pet Care Clinic on August 4, 2015 for additional treatments.  She was 64 pounds at the time she was unlawfully seized by the DAC and had dropped to 34 pounds.  In addition, Ms. Nelson's other dog, Bo, became sick as a result of his contact with Chunk.

168.  Chunk and Bo began to improve after their last veterinarian visit and Ms. Nelson is monitoring both of them.

Kaitlyn McNay-Collins

169.  Kaitlyn McNay-Collins ("Ms. McNay-Collins") resides at 7509 Bramell in the City of Detroit.  She was the owner of two dogs: "Kato" (a Siberian Husky) and "Piper" (a German Shepherd).

170.  On or about October 10, 2014, Ms. McNay- Collins' dogs escaped her fenced-in yard after they were accidentally left in the backyard for four hours.  Apparently, the dogs snapped the bungee-cords that secured the gate.

171.  A neighbor called DAC to assist in getting the dogs out of her yard.

172.  Ms. McNay-Collins returned home to a note on her on her door that her two dogs were in the custody of DAC.

173.   Ms. McNay-Collins went to the Shelter the next day to retrieve her dogs.  The Shelter smelled horrible and after only one day, her dogs were grimy and filthy.  The floors were covered in a dark brown substance and the dogs were wet and covered in urine and feces.  Ms. McNay-Collins observed food on the floor surrounded by feces.

174.   Ms. McNay-Collins was advised that she would have to pay $300 in cash per dog for their license, rabies vaccinations and impound fees.  Ms. McNay-Collins did not have the cash at the time.

175.   After approximately 10 days, Ms. McNay-Collins is able to pay the $300 in cash to get Piper out of the Shelter.  She did not have the full amount needed to also retrieve Kato.  She therefore gave the DAC $125 in cash as a deposit to get Kato.

176.   She eventually came back to the Shelter with the additional $175 to retrieve Kato but the DAC employees said there was no proof of payment of the deposit and that in fact, DAC did not take deposits so they denied that she had made the payment.  She did not have enough money then to retrieve Kato and left that day without him.   Piper came home with a case of "kennel cough" and required treatment.

177.   Ms. McNay-Collins called the Shelter almost daily and visited on numerous occasions.  On her last call, she was told that Kato had been transferred

and was no longer at the Shelter.  DAC stated that they could not disclose the location of the transfer even though Kato was microchipped to Ms. McNay-Collins.

178.  Ms. McNay-Collins spent one month calling the Michigan Humane Society and visiting local shelters looking for Kato.

179.  It was not until Channel 7, WXYZ-TV investigated the story of Ms. McNay-Collin's loss of Kato that DAC advised the reporter that Kato had been euthanized by DAC on November 17, 2014.

<u>Alicia Kathleen Napier</u>

180.  Alicia Kathleen Napier ("Ms. Napier") resides at 8397 Gartner in the City of Detroit.  Ms. Napier had a fenced in yard where she kept four bit bull dogs that she owned; a male, a female and their two puppies.

181.  On or about August, 2014, a stray dog jumped into Ms. Napier's fenced in yard.  A dog fight ensued between Ms. Napier's male pit bull and the stray dog.

182.  According to neighbors, DAC was called because of the fight.  Ms. Napier was not at home at the time.

183.  Although the stray dog was able to jump back over the fence, the DAC arrived and walked into Ms. Napier's fenced in yard, without consent or a warrant, and removed all four of her dogs with a catch pole.

184. Ms. Napier drove up to her house to see DAC removing her dogs. When she inquired as to why they were being taken, the DAC employee told her that all four dogs were taken because of the fight incident and that they had to be quarantined at the Shelter.

185. Ms. Napier argued with the officers of the DAC that they should not remove her dogs. At no time did the officers advise Ms. Napier of the state law that permits an owner to take their animal(s) to a licensed veterinarian for a ten-day hold period following a suspected bite in order to complete a rabies observation and/or to confine the dogs to her own residence for the observation

186. Ms. Napier was not issued a ticket or cited for any violation related to the fighting incident. However, she had to pay $300 per dog to get her dogs out of the Shelter.

187. After ten days, Ms. Napier paid the approximately $1,200 to bring her dogs home. All four dogs came home from the Shelter sick. Each dog had lost approximately 20 pounds and each of them was vomiting uncontrollably. They also had "kennel cough." DAC provided Mucinex to Ms. Napier for her dogs, but she had to refill the prescription twice in order to care for her four sick dogs.

188. After about a one-and-a-half to two weeks, the dogs improved.

## CLASS ACTION STATUS

189.  Plaintiffs incorporate all previous allegations herein by reference.

190.  The Plaintiffs in this action bring this action on behalf of themselves and other similarly situated plaintiffs.

191.  The similarly situated plaintiffs include all dog and other animal owners in the City for the past three years who have had their dogs seized by Defendants at the direction of Ward.

192.  The similarly situated parties may number in the hundreds, if not thousands and joining them as parties in this action would be impractical.

193.  There are common questions of law and fact regarding the Plaintiffs and those similarly situated, including, but not limited to:

a.  Whether the Defendants' policy of seizing dogs violated the constitutional rights of the Plaintiffs;

b.  Whether the City should be enjoined from enforcing its animal control ordinance (or should be made to enforce that ordinance within constitutional limits); and

c.  Whether Defendants' operation of the Shelter contributes to a property deprivation without due process in violation of the Fourteenth Amendment.

194.   The claims of the Plaintiffs named in this action are representative of the claims Plaintiffs believe do exist among those similarly situated.

195.   The Plaintiffs in this action seek monetary and injunctive relief from the Defendants to redress, *inter alia*, the Defendants' unconstitutional treatment of them and their animals.  The Plaintiffs in this action would fairly represent and protect the interests of other similarly situated animal owners who seek to end the Defendants' unlawful actions and seek redress for the damages sustained.

196.   Prosecuting separate actions on behalf of many animal owners who have been harmed by Defendants' conduct would create a risk of inconsistent outcomes that would provide the Defendants with potentially different standards to which they would have to conform their policies. Furthermore, the equitable relief sought by Plaintiffs would be dispositive of similar equitable relief sought by others similarly situated.

197.   The Defendants' violation of the Plaintiffs' constitutional rights are identical to the violation of the constitutional rights of those similarly situated and equitable relief obtained by Plaintiffs would be applicable to the class as a whole.

198.   The core of this complaint concerns the unconstitutional actions of the Defendants and their unlawful seizure of dogs; their unlawful and

unconstitutional impounding of dogs in cruel and unsanitary conditions likely to cause permanent injury or death; and their abuse of their authority extort arbitrary sums of money from Plaintiffs and those similarly situated to Plaintiffs. This core of claims contains questions of fact and law that are common to the Plaintiffs and those similarly situated, and these common factual and legal questions predominate over the individual factual differences between and among the Plaintiffs and those similarly situated.

199.   A class action is the superior method for resolving Plaintiffs' claims and the claims of those similarly situated, as opposed to piecemeal litigation in several courts.

## COUNT I
## MONEY DAMAGES FOR VIOLATION OF 42 U.S.C. § 1983

200.   Plaintiffs incorporate all previous allegations herein by reference.

201.   Defendants, each of them, were, in taking the actions described in tis Complaint, acting under color of state law.

202.   Defendants took the following actions against Plaintiffs:

   a. Entering Plaintiffs' property without consent or a warrant;

   b. Taking Plaintiffs' dogs without consent, a warrant, or any exception to the warrant requirement;

c.  After taking Plaintiffs' dogs, holding plaintiffs' dogs in conditions that were cruel and inhumane, which conditions created an immediate and grave threat to the health and vitality of the dogs;

d.  Taking Plaintiffs' dogs and holding Plaintiffs' dogs in direct contravention of governing state statute;

e.  Holding Plaintiffs' dogs and demanding that Plaintiffs pay arbitrary sums of cash to obtain release of their dogs from the cruel and inhumane conditions of the Shelter;

f.  Holding Plaintiffs' dogs in such unsanitary conditions that the likely and immediate result of such detention was the death of the dogs before any meaningful review of the detention was possible; and

g.  Other acts or omissions that may be determined during the course of discovery in this case.

203.  Through the actions described in this Complaint, Defendants have violated Plaintiffs' rights, as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

204.  Plaintiffs' rights under the Fourth and Fourteenth Amendment – to be free from unreasonable search and seizure and to have due process before

being stripped of their property rights - were clearly established and Defendants' gross misconduct violated these clearly established rights.

205.   The Defendants' actions were part of a custom or policy of the City to deprive Plaintiffs and similarly situated people of their constitutional rights.

WHEREFORE Plaintiffs request that this Court: (1) award them compensatory and exemplary damages as authorized by 42 U.S.C. § 1983; (2) award them their attorney fees, consistent with 42 U.S.C. § 1988; and (3) award any other relief that this Court deems appropriate, just and equitable.

## COUNT II
## INJUNCTIVE RELIEF FOR VIOLATION OF 42 U.S.C. § 1983

206.   Plaintiffs incorporate all previous allegations herein by reference.

207.   Defendants have developed and maintained a policy and custom of violation of the Fourth and Fourteenth Amendments by systematically taking dogs belonging to residents by entering onto private property without consent, a warrant or an exception to the warrant requirement; then impounding the dogs in cruel, inhumane and unsanitary conditions that frequently lead the dogs to contract fatal and near-fatal disease and injury.

208.   The legal lynchpin for this policy of constitutional violation is the City's Animal Control and Regulation Ordinance (Ordinance No. 04-04; Section 6-1-2), which purports to give the City, DAC and the Police Department the

authority to enter onto private property and seize "any animal" for any suspected violation of the animal control ordinances.

209.  The ordinance is unconstitutional on its face and in its application to the Plaintiffs.

WHEREFORE Plaintiffs request that this Court: (1) issue temporary and permanent injunctive relief that: (a) enjoins the enforcement of the Ordinance 04-04, Section 6-1-2; and/or (b) requires the City and DAC to strictly comply with Ordinance 04-04, Section 6-1-2, as proscribed by federal constitutional limits; and/or (c) that the City and DAC suspends enforcement of the ordinance until such time that the City's and DAC's impound facilities are improved such that they consist of clean and sanitary conditions that do not promote disease, injury and death for the animals placed in the facilities; and (3) any other equitable or injunctive relief that this Court deems appropriate, just and equitable.

## COUNT III
## GROSS NEGLIGENCE

210.  Plaintiffs incorporate all previous allegations herein by reference.

211.  Defendants owed Plaintiffs a duty when they seized their dogs to take actions to secure the dogs and prevent them from becoming diseased or dying.

212.   Defendants breached this duty by:

a. Failing to provide safe and sanitary conditions at the Shelter;

b. Failing to respond to, and being deliberately indifferent to, numerous complaints from their own subordinate employees at the Shelter about the unsafe and inhumane conditions at the Shelter;

c. Creating and failing to correct unsafe, unsanitary and cruel conditions at the Shelter by failing to provide even the most basic hygiene for the animals at the Shelter;

d. Creating and failing to correct conditions at the Shelter that were known to cause permanent injury and/or death to the animals impounded at the Shelter; and

e. Other acts or omissions that may be determined during the course of discovery in this case.

213.   Defendants' actions in breaching the duties as described above were grossly negligent because they were reckless and demonstrated a substantial lack of concern as to whether or not injury to, or the death of, the animals would occur.

214.   Defendants' conduct was the direct and proximate cause of the injury to the Plaintiffs' dogs and/or the death of the Plaintiffs' dogs.

46

215.   Defendants' conduct caused economic and non-economic injury to the Plaintiffs.

WHEREFORE Plaintiffs request that this Court: (1) award them compensatory and exemplary damages; (2) award them, as applicable, their attorney fees and costs; and (3) award any other relief that this Court deems appropriate, just and equitable.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

216.   Plaintiffs incorporate all previous allegations herein by reference

217.   Defendants, through the individual and cumulative actions described in this complaint, have engaged in extreme and outrageous conduct.

218.   Defendants acted with the intention of causing the Plaintiffs to be intimidated, scared, and to fear for the safety and welfare of their animals.

219.   Defendants knew that Plaintiffs had invested their economic and emotional resources into the well-being of their animals.

220.   In fact, the Defendants counted on the Plaintiffs' deep emotional and financial investments with their animals to motivate Plaintiffs to do anything they could to save their animals from the inhumane conditions maintained by Defendants at the Shelter, including paying arbitrary and exorbitant sums of money to obtain the animals' release.

221.  Defendants' actions caused Plaintiffs to suffer severe shock, fear, despair and depression in connection with the temporary, and in some cases permanent loss of their animals.

222.  Defendants intended that their actions would have the effect of causing severe emotional harm to the Plaintiffs.

WHEREFORE Plaintiffs request that this Court: (1) award them compensatory and exemplary damages; (2) award them, as applicable, their attorney fees and costs; and (3) award any other relief that this Court deems appropriate, just and equitable.

Dated:        November 4, 2015            Respectfully submitted,

NEUMAN ANDERSON, P.C.

/s/ Jennifer M. Grieco
Jennifer M. Grieco (P55501)
Stephen T. McKenney (P65673)
Kenneth F. Neuman (P39429)
Attorneys for Plaintiffs
401 S. Old Woodward, Suite 460
Birmingham, MI 48009
248.594.5252
jgrieco@neumananderson.com
smckenney@neumananderson.com

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated:      November 4, 2015      Respectfully submitted,

NEUMAN ANDERSON, P.C.

<u>/s/ Jennifer M. Grieco</u>
Jennifer M. Grieco (P55501)
Stephen T. McKenney (P65673)
Kenneth F. Neuman (P39429)
Attorneys for Plaintiffs
401 S. Old Woodward, Suite 460
Birmingham, MI 48009
248.594.5252
jgrieco@neumananderson.com
smckenney@neumananderson.com

49