UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLOYD HARDRICK, JR., ET AL,

      Plaintiffs,

v.

CITY OF DETROIT, ET AL,

      Defendants.

_____/

Case No. 15-13884

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION [14]**

This case involves a facial challenge to the constitutionality of a local ordinance that
purports to allow the City of Detroit, upon probable cause, to enter the private residence
of any individual suspected of violating the City's Animal Control code.  Plaintiffs, a group
of dog-owning Detroit residents, maintain that this ordinance–which does not require the
issuance of a warrant or the existence of special circumstances–violates their Fourth
Amendment right to be free from unreasonable searches and seizures.

Currently before the Court is Plaintiffs' motion for a preliminary injunction to prevent
the City from enforcing Section 6-1-2(e) of the Animal Control Ordinance.  For the reasons
stated more fully below, the Court GRANTS Plaintiffs' request.

**I.    BACKGROUND**

On January 30, 2004, the Detroit City Council passed an ordinance amending
Chapter 6 of the City Code.  Detroit City Ordinance No. 04-04, § 1 (the "Animal Control
Ordinance" or the "Ordinance").  That chapter, titled "Animal Control, Regulation and Care",

governs the "care, control, regulation, and disposition" of animals in the City of Detroit (the "City"). Sec. 6-1-2. The Ordinance establishes a framework for all-things related to the ownership of animals within City limits- including, by way of example, licensing and vaccination requirements, rabies control, and various provisions specifically designed to address so-called "dangerous" or "vicious" animals. A violation of the Animal Control Ordinance is a misdemeanor offense carrying a maximum fine of $500 and up to 90 days in jail. Sec. 6-1-12(c).

The City's Animal Control Division ("ACD")–and its officers–are "designated to enforce the provisions of [the Ordinance]." Sec. 6-1-2(e). In order to fulfill this mandate, the Ordinance confers a number of special "police powers" on the ACD. This lawsuit calls into question the constitutional propriety of one of those provisions, which provides that:

> [t]he animal control officers of the Animal Control Division . . . *shall have the right of entry, upon probable cause* of a violation of this chapter, onto any premises, residence, or real property within the City for the purpose of capturing, collecting, or restraining any animal. Further, such officers shall have the right of entry, upon probable cause, to any premises, residence, or real property for the purpose of examining any animal suspected of having rabies, having been exposed to rabies, or having attacked or bitten a person or any animal.

*Id.* ("Section E") (emphasis added). Plaintiffs argue that the "right of entry" authorized under the Ordinance is facially unconstitutional because it grants blanket authority for warrantless searches and seizures without the existence of special circumstances. While the proper focus of the Court's inquiry in this context "is [on] searches that the [offending] law actually authorizes", *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451, 192 L. Ed. 2d 435 (2015), a summary of the events giving rise to Plaintiff Floyd Hardrick's claim provides some helpful context.

2

On July 13, 2015, while Hardrick was at work, his dog "Mama" apparently pushed out a window screen and escaped from the house. (Plfs' Mot. Ex. 2, Floyd Hardrick Aff. ¶ 2). At some point while Mama was running around the neighborhood, a witness called the Detroit Police Department or ACD and reported that she was missing but had not "attacked anyone or was otherwise vicious." (*Id.*). Some time later that day Mama returned home. According to Hardrick's neighbors, following Mama's return, ACD officers arrived "without a search warrant [and] broke into and entered [Hardrick's] home." (*Id.* at ¶ 3). While inside, the officers located three of Hardrick's dogs- "Puppy" who was in a crate in the basement; "Rocky" who was secured to a chain in the backyard; and Mama. (*Id.* at ¶ 2). For reasons unknown, the officers seized all three dogs and transported them to the City shelter. (*Id.* at ¶ 3-5). Hardrick maintains that "[n]either the [ACD] nor the Police Department ever contacted [him] to obtain [his] consent to enter [his] property and/or to seize [his] animals." (*Id.* at ¶ 6). Furthermore, upon returning home, Hardrick asserts that his side door was left unlocked, and the officers "did not leave any ticket indicating a violation had occurred with the dogs. In addition, neither the [ACD] nor the Police Department left a notice or otherwise advised . . . where [the] dogs were taken." (*Id.* at ¶ 7). The City, for its part, admits that it entered Hardrick's home without a warrant or consent and "captured" his three dogs. (Answer, Dkt. 11 at ¶¶ 23-29).

Upon learning that the ACD had taken custody of his dogs, Hardrick contacted the shelter and "was advised that he would have to pay $130 in cash per dog to retrieve [his] dogs although [he] was not informed as to the basis for these fees [or] charged with any violation . . . ." (*Id.* at ¶ 10). On July 17, 2015, Hardrick arrived at the shelter to retrieve Rocky. After paying the $130 fee, he was taken to the back of the shelter were Rocky was

housed. (*Id.* at ¶ 14).  According to Hardrick, he:

> witnessed deplorable conditions in the Shelter and of the dogs, some of whom looked like they were dying in their cages and/or had been abused. I also observed several dogs with open patches of raw skin. I was surprised that they let my step-daughter walk into the back of the Shelter with me as I had to divert her eyes so that she avoided viewing the horrible condition of the dogs. Rocky was held in a cage that was too small for his size and I observed soggy food on the floor outside of the dogs' cages.

(*Id.* at ¶ 15-16).  Many of the deficiencies observed by Hardrick were corroborated in greater detail by former ACD officer Brittany Roberts. *See* (Plfs' Mot. Ex. 3, Roberts Aff. ¶ ¶ 5-6, 9).  Indeed, she noted that the conditions at the shelter "contributed to a situation where animals in the care and control of the [ACD] were becoming ill, contracting diseases such as the parvovirus, suffering and, in many cases, dying from the lack of proper treatment or medical attention and the poor conditions of the shelter." (*Id.* at ¶ 6).

After being released, Hardrick maintains that Rocky "came home from the [ACD] with a severe case of kennel cough [and] was coughing and spitting-up a white mucous/phlegm." (Hardrick Aff. ¶ 17).  Despite administering the medication that was provided by the ACD, Rocky died four days after leaving the shelter- just short of his fourth birthday. (*Id.* at 18). Hardrick did not have the financial means to secure the release of Puppy or Mama, and believes that they were euthanized by the ACD. The Amended Complaint is replete with examples of other dogs who were seized from their owners without a warrant, housed at the shelter, and fell ill or died shortly after returning home.

## II.   STANDING

As an initial matter, Defendants contend that Plaintiffs lack standing to mount a facial

challenge to the constitutionality of Section 6-1-2(e) because "[n]o plaintiff in this case was subjected to any unconstitutional conduct allegedly allowed by the City Ordinance." (Defs' Br. 11). This argument can be summarily disposed of.

Standing is the "threshold question in every federal case." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). In order to satisfy Article III's standing requirement, Plaintiffs: "(1) must have suffered some actual or threatened injury due [to the] alleged illegal conduct (the 'injury in fact element'); (2) the injury must be fairly traceable to the challenged action (the 'causation element'); and (3) there must be a substantial likelihood that the relief requested will redress or prevent [Plainitffs'] injury (the 'redressability element')." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001).

Here, the crux of Defendants' standing argument is that because "the City's consistent practice has been to enter a residence based either on owner consent or exigent circumstances", Plaintiffs are attempting "to pursue a hypothetical claim." (Defs' Br. 11). But the allegations in the complaint–and Hardrick's affidavit–clearly belie this assertion. Indeed, according to Hardrick, "[t]he [ACD], without a search warrant, broke into and entered my home." (Hardrick Aff. ¶ 3). Moreover, "Puppy" and "Rocky"–two of the dog's seized by the officers–were safely secured inside Hardrick's home, and "Mama", the subject of the eye witness complaint, was located in the backyard. (*Id.* at ¶ 3-5). In other words, notwithstanding the City's purported "consistent practice", Hardrick's dogs were seized without a warrant, consent, or exigent circumstances. And this scenario is echoed throughout the Amended Complaint by several Plaintiffs who have had similar experiences with the ACD. In this way, Plaintiffs have sufficiently alleged actual injury flowing from

5

Defendants' reliance on the Ordinance.

Defendants, for their part, appear to assume–without substantiating–that standing in this context is more properly analyzed under the framework applicable to pre-enforcement overbreadth challenges under the First Amendment. But as the very cases they rely upon make clear, "[f]acial overbreath adjudication is an exception to our traditional rules of practice . . . [and] its function is a limited one at the outset . . . ." *Los Angeles Police Dep't v. United Reporting Publishing Corp.,* 528 U.S. 32, 39-40 (1999). Moreover, as a practical matter, the Court need not discuss the "prototypical exceptions" to the traditional rules, where, as here, Plaintiffs' standing is premised on their own experiences- not some theoretical injury to a third-party. *See Id.* at 39 (emphasis added) ("the allowance of a facial overbreadth challenge to a statute is *an exception to the traditional rule* that 'a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally *to others in situations not before the Court.*"). Finally, Defendants fail to offer any reason why, under *Grendell* and its progeny, Plaintiffs lack standing to assert a facial challenge to the constitutionality of the Ordinance. For that reason, the Court must, and does, proceed to the merits of Plaintiffs' request for preliminary injunction.

## III.   PRELIMINARY INJUNCTION STANDARD

As the Sixth Circuit recently stated in a unanimous *en banc* decision, the district court must balance the following four factors when considering a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others;

6

and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Emps. Assoc. v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (internal quotation marks and citations omitted). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Where constitutional rights are implicated, however, "the likelihood of success on the merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). This is so "because the questions of harm to the parties and the public interest generally cannot be addressed properly . . . without first determining if there is a constitutional violation, . . . ." *Id.*

## IV.   ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs contend that Section E of the Ordinance is unconstitutional on its face because it is repugnant to the Fourth Amendment. However, "[w]hen the constitutionality of a statute is challenged, th[e court] first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty." *Ellis v. Brotherhood of Ry.*, 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). Consequently, "if 'a construction of the statute is fairly possible by which [a serious doubt of constitutionality] may be avoided,' a court should adopt that construction." *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (internal citation omitted) (alteration in original). Therefore, if the plain language of Section E authorizes searches that violate the Fourth Amendment, it must be found unconstitutional. Conversely, if the "statute can be construed reasonably to permit [searches] only when police have obtained a warrant or when an exception to the

7

warrant requirement applies, the statute is constitutional." *Platte v. Thomas Township*, 504 F. Supp. 2d 227, 236 (E.D. Mich. 2007).

Section E authorizes the City's animal control officers, upon probable cause, "the right of entry . . . onto any premises, residence, or real property . . . for the purpose of capturing, collecting, or restraining any animal." Section 6-1-2(e). The Ordinance plainly does not require the officer to obtain a warrant before executing a search of the residence. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Nevertheless, the Supreme Court has recognized that some searches can be reasonable without a warrant where (1) an officer proceeds with the homeowner's consent or (2) there is a danger of "imminent destruction of evidence . . . [or a] risk of danger to the police or others." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (citations omitted). But Section E does not require the existence of a recognized exception to the warrant requirement before proceeding with a search. And the "probable cause" requirement is, at best, a red herring. Indeed, it is well-settled that "probable cause [is] to be decided 'by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *United States v. West.*, 520 F.3d 604, 609 (6th Cir. 2008) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1947)).

Nor does it matter that the City's "longstanding practice" has been to search a residence only "where there is owner consent or exigent circumstances." (Defs' Br. 16). In fact, in *Platte v. Thomas Township*, the court specifically addressed this argument in the context of a statute that permitted officers to demand a breath test for any minor believed

8

to have consumed alcohol.  504 F. Supp. 2d 227, 235.  Upon summarily concluding that the statute was unconstitutional on its face, the court explained that:

> [whether] there are some circumstances under which breath samples can be taken from minors in a constitutional way does little to answer the question whether the statute itself is constitutional, when the statute allows searches and seizures absent the condition of a warrant or an excuse for proceeding without one.

*Id.* at 238.  Similarly here, under *Patel,* the Court is required to focus on "searches that the law actually authorizes . . . . " 135 S. Ct. 2443, 2451.  There is no question that Section E authorizes the City and its agents to execute a search without a warrant or a legal excuse for not obtaining one.  In other words, it plainly "endorses procedures to authorize a search that clearly do not comport with the Fourth Amendment."  *Simon v. Cook*, 261 F. App'x 873, 883 (6th Cir. 2008) (quoting *Warshak v. United States,* 490 F.3d 455, 477 (6th Cir. 2007), *vacated on other grounds*, 532 F.3d 521 (6th Cir. 2008) (en banc).  For this reason, the Court finds that Plaintiffs' facial challenge to Section E has a strong likelihood of success on the merits.

### B. Irreparable Injury

The loss of a constitutional right, "even for a minimal period[ ] of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).  Thus, "when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).

Moreover, the hallmark of irreparable injury is the unavailability of money damages to redress the injury.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).  One of the central allegations in this action is that

Plaintiffs' dogs became seriously ill and, in some cases, died, after being seized and taken to the City shelter.  Indeed, Plaintiffs have presented documentary evidence by way of pictures and an affidavit from Brittany Roberts, a former ACD officer, suggesting that "animals in the care and control of the [ACD are] becoming ill, contracting diseases such as the parvovirus, suffering and, in many cases, dying from the lack of proper treatment or medical attention and the poor conditions at the shelter." (Roberts Aff. ¶ 6).  The City, for its part, offers little of value in response to Plaintiffs' allegations, noting only that it is "taking steps to improve conditions at the facility." (Defs' Br. 19).

While the City's commitment to improving the shelter is encouraging, there is no question that death or serious illness causes irreparable harm to the animals and their owners by way of lost companionship. *See e.g., Michigan Wolfdog Ass'n v. St. Clair County.*, 122 F.Supp.2d 794, 809 (E.D. Mich. 2000) ("Sexual sterilization would cause irreparable harm, at least to the animals").  This is simply not the kind of harm that is readily compensable in the ordinary course of litigation. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992) ("an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate.")  As such, in light of the fact that Plaintiffs have established a strong likelihood of success on the merits, and the City does not seriously contest the current state of affairs at the shelter, the Court finds that this factor likewise tips in favor of entering a preliminary injunction.

### C. Substantial Harm to Others/Public Interest

The last two factors–substantial harm to the City and the interest of the public–also weigh in favor of suspending Section E.   Indeed, the City is hard-pressed to claim that they would be harmed by an injunction since they have "no right to the unconstitutional

10

application of state laws." *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 103 (6th Cir. 1989).  Moreover, as a practical matter, the City has a number of other tools in its arsenal to ensure that the public is adequately protected from dangerous animals.  Under Section 6-1-5, for example, any "animal running loose on public or private property without restraint", may be "declared to be a public nuisance, and *subject to capture* and abatement by the Animal Control Division . . . ." *Id.* (emphasis added); *see also* Section 6-1-1 (Defining "stray animal" under the Ordinance).  Furthermore, the ACD "is authorized to capture and impound any stray dog that is on public property and to return, sell, transfer, or euthanize any such animal . . . ."  Section 6-2-7; *see also* Section 6-1-6 ("[i]t shall be unlawful for a person, upon demand of the Animal Control Division or of the Police Department, to fail to surrender an animal that has attacked, bitten, or scratched a person or animal . . . . ")

In addition to those provisions authorizing the ACD to take immediate action, there is a separate–albeit procedurally complex–process for dealing with individuals suspected of "sheltering vicious [or dangerous] animals."    Sections 6-1-6, 6-1-8. Paradoxically, "dangerous" and "vicious" animals are accorded far more due process under the Ordinance than non-threatening household pets such as Mama, Rocky, and Puppy who were seized without a warrant, consent, or exigent circumstances.  *See e.g.* Section 6-1-8 ("[u]pon a dangerous animal determination, the [ACD] shall provide the owner of the animal a written notification of the determination by certified mail or personal service. Within ten (10) days from the date . . . of the notice of the dangerous animal determination, the owner of the animal may file a written request with the Animal Control Division for a hearing to review the determination. An administrative hearing shall be held as soon as possible, . . . . ").  In this

11

way, prohibiting the City from relying on Section E merely ensures that all warrantless searches are motivated not by the type or breed of one's pet, but rather by "the exigencies of the situation . . . ." *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Finally, the public interest is served by an injunction here because it will protect the due process rights of all dog-owning Detroit residents. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 896 (6th Cir. 2012) ("[T]he public interest is promoted by the robust enforcement of constitutional rights."); *see also Planned Parenthood Ass'n of Cincinnati*, 822 F.2d 1390,1400 (6th Cir. 1987) ("[T]he last factor—whether the public interest is served by the injunction—is also met, since the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional.").  As the Court aptly stated in *Johnson v. United States*, 333 U.S. 10, 14 (1948):

> The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Similarly here, the Court has little trouble concluding that the public's interest under the Fourth Amendment is far greater than any law enforcement objective advanced by Section E.

## V.   Conclusion

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is GRANTED. [15]. The City is hereby prohibited from conducting searches under Section E of the Ordinance unless and until this Court orders otherwise.

12

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 22, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 22, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager