UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLOYD HARDRICK, JR., ET AL,

      Plaintiffs,

v.

CITY OF DETROIT, ET AL,

      Defendants.

_____/

Case No. 15-13884

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [54] AND GRANTING IN PART PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT [55]**

In January 2005, the Detroit City Council passed an ordinance (the "Ordinance") granting special police powers to officers working in the Animal Control Division ("ACD"). Specifically, the Ordinance provided that ACD officers "shall have the right of entry", without a warrant, "onto any . . . real property within the City for the purpose of capturing . . . or restraining any animal." Over a decade later, Plaintiffs, a group of Detroit residents, filed this action challenging the constitutionality of the Ordinance.

On February 22, 2016, this Court granted Plaintiffs' request for a preliminary injunction, finding that the Ordinance "clearly [does] not comply with the Fourth Amendment" because it "authorizes the City and its agents to execute a search without a warrant or a legal excuse for not obtaining one . . . ." *Hardrick v. City of Detroit*, No. 15-13884, 2016 WL 692528, at *4 (E.D. Mich. Feb. 22, 2016). On this premise, Plaintiffs now seek monetary damages against the City and Harry Ward, the former Director of Detroit

Animal Control.[1]  According to the complaint, Defendants improperly seized Plaintiffs' pets and failed to provide adequate post-deprivation remedies.  In addition to asserting two constitutional claims, Plaintiffs maintain that Defendants operated the City shelter in a grossly negligent manner, and that their conduct was purposely designed to inflict emotional distress.  Following the close of discovery, both parties moved for summary judgment, which the Court considers here. (Dkt. 54, 55). For the reasons stated more fully below, the Court GRANTS IN PART Defendants' motion and GRANTS IN PART Plaintiffs' motion.

## I.    BACKGROUND

On January 30, 2004, the Detroit City Council passed an ordinance amending Chapter 6 of the City Code.  Detroit City Ordinance No. 04-04, § 1 (the "Animal Control Ordinance" or the "Ordinance").  That chapter, titled "Animal Control, Regulation and Care", governs the "care, control, regulation, and disposition" of animals in the City of Detroit (the "City").  Sec. 6-1-2.  The Ordinance establishes a framework for all-things related to the ownership of animals within City limits- including, by way of example, licensing and vaccination requirements, rabies control, and various provisions specifically designed to address so-called "dangerous" or "vicious" animals.   A violation of the Animal Control Ordinance is a misdemeanor offense carrying a maximum fine of $500 and up to 90 days in jail.  Sec. 6-1-12(c).

This case revolves around Section 6-1-2(e) of the Ordinance, which provides that:

---

[1] Plaintiffs have voluntarily dismissed Detroit Animal Control and the Detroit Police Department from this action. *See* (Plfs' Resp. 16). Furthermore, Plaintiffs are no longer seeking punitive damages under 42 U.S.C. § 1983. *Id.*

> [t]he animal control officers of the Animal Control Division . . . *shall have the right of entry, upon probable cause* of a violation of this chapter, onto any premises, residence, or real property within the City for the purpose of capturing, collecting, or restraining any animal. Further, such officers shall have the right of entry, upon probable cause, to any premises, residence, or real property for the purpose of examining any animal suspected of having rabies, having been exposed to rabies, or having attacked or bitten a person or any animal.

*Id.* ("Section E") (emphasis added). While the Court has since enjoined the City from relying on Section E,[2] *see Hardrick v. City of Detroit*, No. 15-13884, 2016 WL 692528 (E.D. Mich. Feb. 22, 2016), Plaintiffs' contend that Detroit Animal Control ("DAC") implemented "this ordinance by routinely picking up [their] pets - without a warrant or any recognized exception to the warrant requirement - on penny-ante premises such as claims that the pets were unlicensed." (Plfs' Mot. Summ. J., 1). The Court endeavors to provide a brief overview of the specific facts giving rise to Plaintiffs' individual claims.[3]

## A. Floyd Hardrick

On July 7, 2015, while Plaintiff Floyd Hardrick ("Hardrick") was at work, his dog "Mama" jumped through a glass window and escaped from the house. (Defs' Mot. Summ. J. Ex. 2, Hardrick Dep. Tr. 59:21-25). While Mama was running around the neighborhood, a witness called the Detroit Police Department or DAC and reported that she was loose.

---

[2] Plaintiffs now seek to convert the preliminary injunction into a permanent injunction, which the Court considers here.

[3] On September 16, 2016, Magistrate Judge Anthony Patti recommended dismissing Plaintiff McNay-Collins because "she will not cooperate with legitimate discovery requests, refuses to testify, and will not comply with this Court's orders." (Report and Recommendation, Dkt. 84 at 8). The time to object to the Magistrate Judge's recommendation has since expired, and neither party has lodged a concern. The Court thus ADOPTS the Magistrate's recommendation and hereby dismisses McNay-Collins with prejudice. This leaves 14 Plaintiffs in the case.

(*Id.* at Tr. 56:13-14).   Upon arriving on the scene, Officer Malachi Jackson testified that she "observed a white pit bull mix (later identified as 'Mama') charging people and fence jumping and going in and out of a broken window of the house and acting in an aggressive fashion."  (Defs' Mot. Summ. J. Ex. 36, Jackson Aff. ¶ 5).  According to Hardrick, however, "witnesses on the block" later told him that Mama wasn't vicious and that she didn't attack anybody", (*Id.* at Tr. 56:13-14), but rather that DAC chased her "with guns out, like they were going to [shoot] . . . and that they scared the dog outside the house and cornered it, . . . ." (*Id.* at Tr. 61:15-23).

In the midst of DAC's pursuit, Mama successfully negotiated her way back to the house, jumping through the broken window to avoid capture.  Fearing "an immediate threat to public safety", Officer Clark pursued Mama into the house. (Jackson Aff. ¶ 9).  Once inside, Officers Clark and Jackson located three dogs- "Puppy" who was in a crate in the basement; "Rocky" who was secured to a chain in the backyard; and Mama.  (*Id.* at ¶ 10).  According to Officer Jackson, because "neither Puppy nor Rocky were being properly cared for . . . . " they seized all three dogs and transported them to the City shelter.  (*Id.*)  There is no dispute that the Officers entered Hardrick's home without a warrant or consent. (Answer, Dkt. 11 at ¶¶ 23-29).

Around 10 p.m. that evening, Hardrick returned from work "to find all three of [his] dogs, including Puppy[,] [missing] . . . ." (Plfs' Mot. Summ. J. Ex. 33, Hardrick Aff. ¶ 8). Neither "the DAC nor the Police Department left a notice or otherwise advised [Hardrick] where [his] dogs were taken."  (*Id.)* After talking to his neighbors and calling a number of local animal organizations, Hardrick was able to deduce that his dogs were taken to the City shelter. (*Id.* at ¶ 10).  The following morning, he reached out to DAC and was informed

4

that he "had to pay $130 [each] to get [his] dogs back." (Hardrick Dep. Tr. 75:2-11). In the end, Hardrick was unable to raise enough money to spring all three dogs, and he "gave written consent for Mama and Puppy to be euthanized." (*Id.* at Tr. 77: 11-16).   As for Rocky, Hardrick maintains that he "came home from the DAC with a severe case of 'kennel cough'[,] was unable to bark at all and was coughing and spitting up a white mucous/phlegm."  (Hardrick Aff. ¶ 17).  Rocky died at home on the morning of July 21, 2015. (*Id.*).

### B. Bianca Peterson

On June 12, 2015, DAC received a "Report of Animal Bite" indicating that AT&T employee Julian Palmer was bit on the left hand by a blue pitbull who allegedly resided at 16865 Wildemere in Detroit.  (Defs' Mot. Summ J. Ex. 6, Bite Report).  Plaintiff Bianca Peterson lived at the address identified in the report along with her fiancé and blue pitbull, Rocco. Later that day, two DAC officers arrived at Peterson's home and explained that, because Rocco matched the description of the dog in the bite report, they were required to take him to the shelter for a ten-day rabies hold. (Defs.' Mot. Summ. J. Ex. 7, Peterson Dep. Tr. 52-54).  As Peterson explained, "I told them don't go in my yard. I told them to get off my property without some type of proof." (*Id.* at Tr. 58:23-25).  Eventually, however, she relented: "[t]hey told me because of my refusal to turn him over that I would get charged for harboring a vicious animal. With that charge, I would have to pay $500. On top of that, I would serve 30 days in jail for harboring a vicious animal . . . ." (*Id.* at Tr. 58-59).

On July 22, 2015, Rocco was released from the shelter.  (*Id.* at Tr. 64: 19-25).  Three days later, he was taken to Veterinary Emergency Service with "possible kennel cough." (Plfs. Mot. Summ. J. Ex. 6, Rocco Medical Records).  Rocco's condition continued to

decline and, on June 29, Peterson made the difficult decision to have him euthanized. (*Id.*) While Rocco's cause of death was never determined, he tested positive for heartworm disease and his medical records indicate that "there [was] a chance he could have . . . severe bronchopneumonia, tracheal avulsion . . . or some other condition." (*Id.*).

### C.  Theresa Robinson

In 2015, Plaintiff Theresa Robinson ("Robinson") lived with her two dogs, Sparkles and Diamond, on 7813 Warwick in Detroit. (Defs.' Mot. Summ. J. Ex. 42, Dep. Tr. 43-44). At some point, Robinson defaulted on the terms of her lease agreement, and she was ordered to vacate the premises. (*Id.* Ex. 43, Judgment of Possession; Order of Eviction). On October 5, 2015, several bailiffs arrived at Robinson's home to reclaim the property. By the time Robinson returned from running errands, "they had already kicked the door in . . . . [and] Diamond and Sparkles were already on the Detroit Animal Control truck." (*Id.* Dep. Tr. 45:1-2; 47-48). After unsuccessfully pleading with DAC to release Sparkles and Diamond, the dogs were transported to the shelter and impounded. (*Id.* Dep. Tr. 55-56). Neither dog was licensed or tagged at the time they were removed from the residence. (*Id.* Dep. Tr. 44:8-15).

Approximately two weeks later, Robinson went to the shelter to retrieve her dogs. (*Id.* Dep. Tr. 56:23-25). Unfortunately, Diamond had passed away, and DAC personnel were seemingly unclear on the details. (*Id.* Dep. Tr. 57-58). After paying $15 in license and vaccination fees, Sparkles was released. (*Id.* Dep. Tr. 58: 8-11). According to Robinson, when she "picked [Sparkles] up from the animal shelter she had kennel cough, whatever that is, and she's been making that same noise on and off ever since . . . ." (*Id.* Dep. Tr. 59:8-11). As of May 2016, Sparkles was still alive. (*Id.* Dep. Tr. 58:13-14).

### D.  Rochelle Munson-Griffin

In mid November, 2014, Plaintiff Rochelle Munson-Griffin's ("Griffin") dog Meijer killed a racoon in her backyard. (Defs.' Mot. Summ. J. Ex. 17, Griffin Dep. Tr. 30:3-6). While Meijer appeared to be fine, Griffin took him to DAC to be examined. (*Id.* at Dep. Tr. 30:20-22). Upon arriving, Griffin was informed by DAC personnel that, due to Meijer's possible exposure to rabies, he was required to be quarantined for ten-days at the shelter. (*Id.* at Dep. Tr. 40:6-13). Griffin reluctantly agreed, even though she later maintained that "they told me I couldn't take my dog home, so I had no recourse at that moment." (*Id.* at Dep. Tr. 40:17-20).

Meijer was released from the shelter on November 24. Despite arriving "healthy as a lark", Griffin maintains that Meijer's "entire body was in shock when he came home to me. He had not been treated fairly. He had a cough. He would not eat. [His] limbs were swollen . . . [and he] walked with a limp." (*Id.* at Dep. Tr. 56: 6-14). Five days later, Meijer was admitted for emergency treatment at Blue Pearl Veterinary. (Plfs. Mot. Summ. J. Ex. 9, Notice of Deceased Patient). Meijer's medical records note that he "had moderate amounts of yellow-green discharge OU from both nares, and was intermittently coughing." (*Id.*). Ultimately, the attending physician concluded "that this carries a poor prognosis even with aggressive therapy in his current state", and Griffin elected to have Meijer euthanized. (*Id.*)[4]

---

[4] The record indicates that Michigan State University performed a necropsy on Meijer. While the final report was not included in the record, some of the findings were discussed at Griffin's deposition. In short, the "most significant lesions observed . . . were severe inflammation over the left fore limb and in the left elbow joint", which could be a consequence of "racoon exposure." (*Id.* at Dep. Tr. 53:13-21). The report also apparently noted that streptococcus bacteria was isolated from the wound and lungs, "which suggests that the leg was the originating focus of the infection . . . ." (*Id.* at Dep. Tr. 54:6-13). Escherichia coli (also known as "E. Coli") was also present in Meijer's body.

7

### E.  Frederick Douglass Weems

In September 2015, Plaintiff Frederick Douglas Weems ("Weems") was living at 16560 Beaverland in Detroit with his dog, Scrappy. (Defs.' Mot. Summ. J. Ex. 40, Weems Dep. Tr. 14:3-7).  Weems was subleasing a room from an individual known as "Fatman", who purportedly owned the Beaverland property.  On September 24, 2015, while Weems was at work, he "received a call from a neighbor indicating that the Detroit Land Bank was at the home with a large truck, as well as the Detroit Police Department and [DAC]."  (*Id.* at Dep. Tr. 65:3-11).  The neighbor indicated that the Land Bank was removing Weems' personal property from the home and preparing to take Scrappy to the shelter. (*Id.* at Dep. Tr. 65:15-22).  As it turned out, the Wayne County Treasurer "acquired the [Beaverland] property though foreclosure in 2014."  (Defs.' Mot. Summ. J. Ex. 41, Camargo Aff. ¶3). Despite Weems' request, DAC refused to release Scrappy to the neighbor. (*Id.*).

Four days after Weems was evicted, he went to the shelter to check on Scrappy.  He soon learned that Scrappy's release was conditioned on the payment of $130- covering a dog license, vaccination, removal, and lodging fees. (*Id.* at Dep. Tr. 70:7-25). Unfortunately, Weems did not have the cash on hand, but indicated he would return on October 23 after he was paid. (*Id.* at Dep. Tr. 73:13-15). On October 19, Weems was informed that Scrappy had passed away. (*Id.*)  The DAC was unable to explain the circumstances leading to Scrappy's death, but Weems maintains that it was related to the condition of the shelter. (*Id.* at Dep. Tr. 80:21-22).  Aside from his own general observations of the facility, Weems conceded that he did not have any specific evidence in support of this conclusion. (*Id.* at Dep. Tr. 81:3-6).

### F.  Rousia May

8

In early June 2015, Plaintiff Rousia May ("May") was sitting on the front porch with her two dogs, "Brick" and "Pretty Mama"; neither dog was restrained. (Defs.' Mot. Summ. J. Ex. 3, May Dep. Tr. 42:13-17). Brick took off running towards Seven Mile. (*Id.* at Dep. Tr. 42:23-25). May and Pretty Mama separately pursued Brick until they reached the intersection of Seven Mile and Strasburg. (*Id.* at Dep. Tr. 46:1-3). According to May, "I told Pretty Mama to stay and sit [unrestrained] at the mailbox, and she did; so I crossed Seven Mile to get Brick." (*Id.* at Dep. Tr. 46:8-9). Shortly after crossing the street, May captured Brick and carried him back to the mailbox. (*Id.* at Dep. Tr. 47:2-6). To her surprise, "Animal Control had already picked up Pretty Mama" and put her in the truck. (*Id.* at Dep. Tr. 47:11-12). While it's unclear exactly what happened next, May maintains that she "picked Brick up and put him on the truck and asked [Animal Control] to bring him [and Pretty Mama] home . . . ." (*Id.* at Dep. Tr. 48:9-11). Instead, DAC transported both dogs to the shelter. May eventually retrieved Pretty Mama after paying $100 in license and vaccination fees, but Brick wasn't so lucky. (*Id.* at Dep. Tr. 49). Because he was microchipped in someone else's name, DAC policy required proof that ownership was transferred to May. Unfortunately, Brick died before May was able to acquire the proper documentation. (*Id.* at Dep. Tr. 52:12-14).

### G. Thomasina McConnell

On July 9, 2015, Detroit Police were dispatched to 18973 Wormer on a report that Frances Goodwin "was walking [eastbound] on 7 mile pass[ed] Woodbine [street] with her son John Sanford . . . . [when] a brown and white pitbull . . . took off running . . . [and] chased after her son and bit him on his right calf. The dog ran off after [the incident]."

9

(Defs.' Mot. Summ. J. Ex. 22, Detroit Police Report at 1). Upon surveying the surrounding area, Officer Lauren Russell observed "a brown and white pitbull loose with his owner." (*Id*.). Plaintiff "Thomasina McConnell of 18988 Woodbine [] advised it was her dog. Ms. McConnell stated her daughter Miah . . . took the dog outside and he got off of the chain." (*Id*.). McConnell agrees with this much, but "claims that nothing happened between the time [her dog] Bam got out of the backyard and the police showed up." (Defs.' Mot. Summ. J. Ex. 23, McConnel Dep. Tr. 59:3-5). In other words, McConnell denies that Bam ever bit anyone.

Officer Russell advised McConnell that, in light of Sanford's report–and presumably Bam's proximity to the scene of the incident–Bam was required to be quarantined for ten-days at the shelter. (*Id*. at Dep. Tr. 59:16-19). At the Officers' direction, McConnell transported Bam to the shelter. (*Id*. at Dep. Tr. 61:2-4). According to DAC records, "Investigator Crosby spoke to [McConnell] who [initially] said that she did not want the dog back and would . . . permanently surrender all rights of ownership or control of the dog." (Defs.' Mot. Summ. J. Ex. 25, DPD Memorandum). Ultimately, however, McConnell refused to sign the surrender form and was issued three misdemeanor tickets for violating the following City ordinances: (1) 6-2-1(a): Failure to obtain a license for a dog; (2) 6-2-6(a): Failure to keep dog on owner's property; and, (3): 6-1-6(a): Harboring a "vicious" animal. *Id.*

At some point during Bam's stay at the shelter, McConnell testified that she went to visit him and "his eyes were bloodshot, the blood vessels had burst in his eyes. He had lost a lot of weight. He had a lot of mucus coming from his nose and his mouth. And he was soaking wet. [T]here was blood coming off his back paws." (Plfs.' Mot. Summ. J. Ex. 13,

10

McConnell Dep. Tr. 82-83). The veterinarian on staff purportedly told McConnell that Bam's condition was a result of "using a catch pole to move him around and the pole had been choking him . . . ." (*Id.* at Dep. Tr. 83:4-6).  After speaking with the City prosecutor, it was agreed that Bam would be transferred to Groesbeck Animal Hospital for further care. Once there, Bam bit one of the workers in McConnell's presence, drawing blood. (*Id.* at Dep. Tr. 75:19-25). While it's unclear whether McConnell agreed to the procedure, Bam was ultimately euthanized following the incident at the animal hospital. (*Id.* at Dep. Tr. 77-78). According to McConnell, "Bam was not the same from his treatment at [DAC]. He was very untrusting."  (*Id.* at Dep. Tr. 79: 23-25).

### H. Veronica Seward

In June 2015, Plaintiff Veronica Seward ("Seward") was at home with her dog "Major" when a child–Jameer–knocked at the front door. (Defs.' Mot. Summ. J. Ex, 19, Dep. Tr. 60). Seward opened the door and Jameer handed her a "ball that goes on a children's play arrow." (*Id.* Dep. Tr. 60:5-6).  In a matter of seconds, Jameer ran off and Major bolted through the doorway chasing behind him. (*Id.* Dep. Tr. 61:9-10).  Seward ran out the door and quickly corralled Major, but not before he knocked Jameer over. (*Id.* Dep. Tr. 62-63). Around 30 minutes later, Detroit Police arrived and informed Seward that Major was accused of biting Jameer during the encounter. (*Id.* Dep. Tr. 71:1-12).  Seward denied the report, but agreed to release Major to DAC officers for a ten-day rabies hold. (*Id.* Dep. Tr. 73:7-10).

On July 7, 2015, following the expiration of the hold, Seward maintains that she paid $290 and Major was released. The next day, DAC went back to Seward's residence and served her with three citations for (1) harboring a vicious animal, (2) failing to obtain a dog

11

license, and (3) having a "dog at large." (Defs.' Mot. Summ. J. Ex. 20, 36th District Court Docket). According to Seward, Officer Tamacie Crosby "threatened to have [her] arrested . . . and take[n] to jail in front of [her] kids" if she did not surrender Major for the second time. (Seward Dep. Tr. 78-79). In the end, Seward permitted the officers to take Major, but only because she believed Crosby "was going to imprison [her]" if she refused to comply. (*Id.* at Dep. Tr. 81:18-19).

Two days after Major was impounded, Seward visited the shelter and found him "sitting in dried blood [and] his own stool." (*Id.* at Dep. Tr. 81:18-19). In light of Major's condition, he was transferred to the Harper Woods Veterinary Hospital for treatment. According to a necropsy report prepared by Michigan State University, Major was diagnosed with parvovirus and treated with "intravenous fluids, antibiotics, and anti-emetics, but [his] condition deteriorated" and he died on July 11- three days after he was impounded. (Plfs.' Mot. Summ. J. Ex. 18, Michigan State Necropsy Report).

## I. Alicia Napier

On August 15, 2014, Detroit Police were dispatched to 8397 Gartner in response to a report that five dogs were fighting in Plaintiff Alicia Napier's ("Napier") backyard. (Defs.' Mot. Summ. J. Ex. 9, Police Activity Log). According to Napier, who was not present when the fight occurred, a stray dog jumped into her yard and incited the melee.[5] When Napier returned home, DAC was in the process of removing the dogs. Despite her objections, DAC impounded the animals for a ten-day rabies hold. It was later determined that "Loco", one of Napier's dogs, suffered a bite wound. (Defs.' Mot. Summ. J. Ex. 10, DAC Medical

---

[5] Napier has not been deposed or offered an affidavit in support of her assertions.

12

Records). In the end, all four dogs were released to Napier at the conclusion of the observation period and the payment of $1,000 in vaccination, license, and holding fees. (*Id.* Ex. 11, DAC Receipt).

### J. Kenneth Savage

Plaintiff Kenneth Savage ("Savage") has three dogs- "Isis", "Heru", and "Beautiful." On or around April 2, 2015, Isis and Heru were involved in a particularly gruesome incident with Roscoe, a neighbor's dog. Roscoe attempted to attack the dogs by sticking his snout through a hole in Savage's chain link fence. (Plfs.' Mot. Summ. J. App'x Ex. 19, Savage Dep. Tr. 94). Savage's dogs responded by latching on to Roscoe's nose, causing irreparable damage in the process. (*Id.* at Dep. Tr. 100-101). In the end, Savage and his neighbor "agreed to contact Detroit Animal Control because it appeared that [Roscoe] was severely injured and should be humanely euthanized." (*Id.* at Dep. Tr. 101:15-18).

Upon arriving, DAC Officer Crosby informed Savage that Isis and Heru were subject to mandatory quarantine under Detroit City Code. (Defs.' Mot. Summ. J. Ex. 22, Officer Crosby Dep. 139:2-3). Savage resisted Officer Crosby's demands and refused to surrender his dogs. According to DAC's report, Savage was cited for harboring a vicious animal and failing to obtain a license for Isis and Heru. (Defs.' Mot. Summ. J. Ex. 32, DAC Report).

On September 25, 2015, Savage appeared in 36th District Court to contest the citations. While Savage was in court, DAC returned to his residence to impound Isis and Heru. (Savage Dep. Tr. 141-142). Savage testified that his roommate, Ashley Franklin, observed DAC swarm the backyard and capture Heru and Beautiful. (*Id.* at Dep. Tr. 142:13-21). Moments later, the officers knocked on the door and demanded Isis, but

Frankin "slammed the door" and denied them entry.  (Dep. Tr. 142:13-21).  There is no dispute that DAC entered Savage's backyard without a warrant or consent. (Plfs.' Mot. Summ. J. Ex. 4, Request to Admit at ¶¶ 33-34).  Ultimately, Isis and Beautiful–who was not involved in the April incident–remained in the shelter for over a month before Savage was able to secure their release. *See* (Defs.' Mot. Ex. 32, DAC Report) (indicating that, on November 3, 2015, Officer Crosby informed Savage "that he was able to pick up his two dogs at animal control . . . now that he has proper ID.)

### K.  Myrtle Rice

In August 2015, Plaintiff Myrtle Rice's ("Rice") dog Charlotte "went out the front door . . . and was running around the yard and into the front of the street, . . . . " (Second Am. Compl. ¶ 212).  DAC Officer Jackson, who happened to be in the neighborhood at the time, witnessed Charlotte "run of out house", and noted that she "would not listen to the owner." (Plfs.' Mot. Summ. J. Ex. 20, DAC Run Sheet).   Officer Jackson elected to pursue Charlotte, and ultimately captured her in a net. (Second Am. Compl. ¶ 214). Despite Rice's protests, Charlotte, who was unlicensed at the time, was deemed a stray and later impounded.  Charlotte was released the following week after Rice paid $105 in license and impound fees. (Defs.' Mot. Summ. J. Ex. 2, DAC Invoice).

### L.  Stephen Shackleford

On June 1, 2015, DAC was dispatched to 18819 Klinger on a report that a large stray pitbull was roaming the area. (Defs.' Mot. Summ. J. Ex. 5, Parrish Aff. at ¶ 3).   After scanning the surrounding neighborhood, DAC encountered a tan pitbull ("Kobe") one block away from Klinger. (*Id.* at ¶ 4).  DAC Officer Parrish "determined that the dog was not wearing a Detroit license tag, and pursued it to 18820 Gallagher, where [he was] met by

Detroit Police officers." (*Id.* at ¶ 5).  Once there, Plaintiff Stephen Shackelford's ("Shackelford") neighbor grabbed Kobe, locked him in his backyard, and immediately called Shackelford to inform him that "there was some Animal Control people . . . after [his] dog . . . [and he] needed to come to the house . . . ." (Plfs.' Mot. Summ. J. Ex. 21, Shackelford Dep. Tr. 70:5-13).

When Shackelford arrived home, Officer Parrish informed him that Kobe had been running loose and that they intended to impound him as a stray. (*Id.* at Dep. Tr. 22-24). Predictably, Shackelford resisted, and, as he testified, things began to escalate: "[The officers] stood before me and said you're going to give the dog up . . . and they put their hands directly on their pistols, and they unlatched the clip on the pistol, indicating that they would draw their pistol." (*Id.* at Dep. Tr. 76-77).  Ultimately, Shackelford retrieved Kobe "from the backyard and . . . gave [him] over to the Detroit Animal Control."  (*Id.* at Dep. Tr. 78:19-22).

Approximately four days later, DAC released Kobe after Schakleford paid his license and vaccination fees. (*Id.* at Dep. Tr. 81:15-19).   Shortly after they arrived home, Shackleford testified that Kobe "had mucous draining from his nose and mouth." (*Id.* at Dep. Tr. 80:20-21). On June 13, Kobe died after collapsing in Shackelford's backyard. (Id. at Dep. Tr. 82).  The official cause of death is unknown.

### M. Joseph Link

On June 23, 2015, Detroit Police responded to a 911 call from Emma Collins ("Collins") regarding an alleged dog mauling that took place on her property. (Defs. Mot. Summ. J. Ex. 14, DAC Surrender Form).  According to Collins, "she was in her fenced backyard with her dog when the dog from 7695 Rockdale jumped over her fence, knocked

15

her to the ground and then grabbed her dog in it's mouth." (*Id.* Ex. 15, Ward Email). The dog identified in Collins' compliant, "McLovin", belonged to Plaintiff Joseph Link ("Link"). (*Id.*). As Link later conceded, this was not the first time McLovin got loose. (*Id.* Ex. 12, Link Dep. Tr. 51:3-5). Indeed, six months prior to the alleged attack, "a DAC unit was dispatched . . . in response to a citizen complaint of 'vicious dog chasing' and captured 'McLovin' [r]unning-at-[l]arge." (*Id.*); *see also* (Link Dep. Tr. 51). Nevertheless, Link adamantly denied McLovin's involvement in this particular incident.

In light of Collins' report, McLovin was impounded by DAC for a ten-day rabies hold. (Plfs.' Mot. Summ. J. Ex. 23, Link Dep. Tr. 36). At the conclusion of the observation period, DAC Officer Crosby informed Link that "he had two options, either he can agree to have [McLovin] put down by the City of Detroit or I can issue a vicious ticket and the judge would decide." (*Id.* at Ex. 25, Transcript of Recording). Link opted for the latter, and was charged with harboring a vicious animal and having a dog at large. Ultimately, the 36th District Court dismissed the vicious dog ticket on a motion for directed verdict, and Link was acquitted of the second charge. On March 12, 2015, nearly nine months after McLovin was impounded, he was released from the shelter. (Defs.' Mot. Summ. J. Ex. 16, DAC Bite Report). Link later testified that DAC "had taken good care of McLovin during his stay". (Link Dep. Tr. 48:16-21).

### N. Christie Nelson

The facts pertaining to Plaintiff Christie Nelson's ("Nelson") claims are not supported by any evidence in the record because she failed to attend two scheduled depositions. *See* (Dkt. 68). "[I]n order to mitigate any prejudice suffered by Defendants in having to wait so long for Ms. Nelson's deposition, . . . she [was] prohibited from supporting or opposing her

16

claims and defenses with her own affidavit or declaration . . . . ", unless Defendants chose "to supplement their motion for summary judgment using information from the deposition . . . ." (Dkts. 68, 84). Defendants have not opted to supplement their motion.

According to the amended complaint, on July 17, 2015, Nelson's dog "Chunk" was drinking "water on the sidewalk located directly in front of her yard[,] . . . when she heard someone yell 'go back into the yard . . . .'" (Am. Compl. ¶¶ 162, 164). After retrieving Chunk and leading her inside, Nelson was approached by a DAC Officer who "indicated that someone had called the Police Department [and reported] that a dog was running loose, chasing people in the neighborhood." (*Id.* at ¶163). The Officer informed Nelson that because Chunk was found unrestrained on a public sidewalk, he was required to impound her. Nelson initially objected to the Officer's demands, but eventually agreed to release Chunk after being told "that she could come retrieve her at the shelter and pay the required fees." (*Id.* at ¶166). Chunk was released three days later with the payment of $130. (*Id.* at ¶170).

Upon returning home, Nelson maintains that Chunk began to exhibit signs of kennel cough and eventually stopped eating. (*Id.* at ¶ 170). After purportedly losing half of her body weight, Nelson sought professional treatment for Chunk's condition. (*Id.* at ¶¶ 169-171). Chunk has since improved and Nelson continues to monitor her well-being. (*Id.* at ¶172)

## II.   SUMMARY JUDGMENT STANDARD

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a);

17

*S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III.   ANALYSIS

The parties cross-motions for summary judgment revolve around three central issues: first, whether Defendants seizure of Plaintiffs' pets was objectively reasonable under the Fourth Amendment; second, whether Defendants violated Plaintiffs' Fourteenth Amendment right to procedural due process by failing to provide notice and a pre-deprivation hearing; and finally, whether Plaintiffs have presented sufficient evidence to establish that Defendants operated the City shelter in a grossly negligent manner under Michigan law. The Court considers each in turn.

### A. Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A seizure of property occurs when "there is

18

some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 124–25 (1984). There "can be no dispute that an animal owner has a substantial interest in maintaining his rights in a seized animal." *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 727 (6th Cir. 2011) (quotations and citations omitted); *see also Altman v. City of High Point, N.C.*, 330 F.3d 194, 203 (4th Cir. 2003) ("Accordingly, on the strength of the Constitution's text, of history, and of precedent, we hold that the plaintiffs' privately owned dogs were "effects" subject to the protections of the Fourth Amendment."). Therefore, Plaintiffs' claim hinges on the reasonableness of Defendants' seizure, the touchstone of a Fourth Amendment violation.

In determining whether a seizure is objectively reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" by analyzing the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Such analysis is done "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). The "subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable." *Graham*, 490 U.S. at 397. Rather, "[t]he task of [the Court] is to put itself into the shoes of the officers at the time the actions took place and to ask whether the actions taken by the officers were objectively unreasonable." *Altman,* 330 F.3d at 205.

19

The City of Detroit's Animal Control Ordinance empowers officers to seize dogs in a variety of circumstances. Under Section 6-3-3, for example, "Animal Control . . . shall capture, impound, and harbor all stray animals, and all animals owned or harbored contrary to the provisions of this chapter." Stray animals are broadly defined as "any animal running loose on public or private property without restraint." Sec. 6-1-1. Similarly, "[i]t shall be unlawful for a person, upon demand of the Animal Control Division or of the Police Department, to fail to surrender an animal that has attacked, bitten, or scratched a person or animal . . . ." Sec. 6-1-6(e). While Plaintiffs do not challenge the constitutionality of these provisions, there is no question that the vast majority of dogs seized by DAC in this case were either "stray"–as that term is defined–or suspected of attacking or biting another animal or human. In other words, the Court must first consider whether an officer's exercise of authority under these provisions is objectively reasonable under the framework set forth in *Graham* and its progeny. At least one court has answered that question in the affirmative, and several others have implicitly concurred.

Indeed, in *Skinner v. Chapman*, the court had seemingly little trouble concluding that the temporary taking of a dog, without a warrant, did not rise to the level of a Fourth Amendment violation. 326 F. Supp.2d 431, 433 (W.D.N.Y. 2004). There, the plaintiffs' dog, "was not licensed, had not received a rabies vaccination, and was suspected of being at large and biting a child." *Id.* at 433. Under New York law, an animal control officer was permitted "to seize any dog because, among other reasons, it is not licensed, it poses an immediate threat to public safety, or it is 'in violation of any local law or ordinance relating to the control of dogs.'" *Id.* (citations omitted). Because the defendants actions "were

20

reasonable and consistent with state and local law", the court was hard-pressed to find a constitutional violation. *Id.*

The rationale endorsed in *Skinner* has likewise been applied in the context of a far more invasive seizure; namely, the permanent destruction of a pet. As the Fourth Circuit aptly explained in *Altman*,

> When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing [harm to citixens] waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance.

330 F.3d at 205–06.  In other words, "[t]he government retains a strong interest in allowing law enforcement officers to protect themselves and the citizenry from animal attacks" *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 271 (D. Conn. 2005), and "an unreasonable seizure does not occur when officers kill a dog that [poses] an imminent threat." *Preston v. City of St. Clair Shores*, 14-12751, 2015 WL 12516687, *4 (E.D. Mich. 2015); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001) ("Where a pet is found at large, the state undoubtedly has an interest in restraining it so that it will pose no danger to the person or property of others. The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody.").

In contrast to *Altman, Dziekan,* and *Preston*, the officers here did not use deadly force to seize Plaintiffs' dogs.  This is noteworthy for a few reasons. First, as the facts outlined above make clear, in many instances Defendants were faced with extremely dangerous and unpredictable scenarios. Instead of acting out of fear or in the heat of the moment, they

21

waited until the dogs could be safely contained before executing a seizure.  And this matters; the temporary nature of the seizures–i.e. "the nature and quality of the intrusion on the individual's Fourth Amendment interests"–must be weighed "against the countervailing governmental interests at stake."  Here, there is no dispute that, at the time Plaintiffs May, Rice, Shackelford, Nelson, Peterson, Griffin, McConnell, Seward, Napier, Savage, and Link's dogs were seized, they were either (1) roaming unrestrained, (2) unlicensed, or (3) accused of biting another animal or human. Similar to *Skinner*, the City's interest in protecting "the public health, safety, and welfare" far outweighed Plaintiffs' interest in being temporarily deprived of their pets.  Therefore, with respect to the 11 Plaintiffs thus mentioned, the Court finds that Defendants' temporary seizure was objectively reasonable under the circumstances.

The facts giving rise to Robinson, Weems, and Hardrick's Fourth Amendment claims, on the other hand, do not fit neatly within this framework because they involve both a warrantless search *and* seizure. As a general rule, warrantless searches and seizures inside a home are "presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (citations omitted).  However, an individual seeking Fourth Amendment protection must first "demonstrate that he had a legitimate expectation of privacy" in the premises searched.  *United States v. Hunyady*, 409 F.3d 297, 300 (6th Cir. 2005).  The "factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the [property]." *Id.* (citing *United States v. McRae*, 156 F.3d 708, 711 (6th Cir.1998) (concluding that a defendant who had been living in a vacant house for approximately one week had failed to demonstrate that he had a legitimate expectation of privacy); *see also*

22

*Thomas v. Cohen*, 304 F.3d 563, 575 (6th Cir. 2002) *("*The Supreme Court recognized in *Soldal* that a showing of unreasonableness where officers act pursuant to a judicial order [of eviction] 'would be a laborious task indeed.'")

Here, Robinson and Weems have failed to establish that they had "lawful control of the premises searched" by DAC. On the contrary, the record indicates that Robinson's dogs were found in a rental property that she lost all legal interest in a month earlier. *See* (Defs.' Mot. Summ. J. Ex. 43, Judgment of Possession; Order of Eviction). Similarly, Weems' dog, Scrappy, was discovered in a house that was owned by the Detroit Land Bank. *See* (Defs.' Mot. Summ. J. Ex. 41, Camargo Aff. ¶3).  In this way, neither party had "lawful possession" of the property where their dogs were seized, and thus no reasonable expectation of privacy under the Fourth Amendment.  Under these circumstances, it was objectively reasonable for DAC to assume that the dogs had been abandoned, and temporarily impound them barring further investigation.

Finally, with respect to the warrantless search of Hardrick's residence, Defendants argue that "the officers acted to address an emergency situation . . . which demanded urgent action . . . ." (Defs.' Mot. Summ. J. 26).  Commonly referred to as the "exigent circumstances" exception, "warrantless entry may be upheld if there is a 'need to protect or preserve life or avoid serious injury either of police officers themselves or of others.'" *United States v. Williams*, 354 F.3d 497, 505 (6th Cir. 2003) (quoting O'Brien v. City of Grand Rapids, 23 F.3d 990, 997 (6th Cir. 1994)). The "risk of danger exigency" most frequently justifies warrantless entries "in cases where the Government is acting in something other than a traditional law enforcement capacity."  *Id.* at 503.

23

Here, according to animal control Officer Jackson's testimony, the circumstances compelling DAC's entry into Hardrick's home were, to say the least, chaotic: upon arriving to 6261 Plainview, "I observed a white pit bull mix (later identified as 'Mama') charging people and fence jumping and going in and out of a broken window of the house and acting in an aggressive fashion. There was no owner or other person present at the residence when I arrived and I could not secure Mama who avoided capture by going back into the house through the open window." (Defs' Mot. Summ. J. Ex. 36, Jackson Aff. ¶5).  Under these circumstances, the Court finds that the officers had an objectively reasonable basis for believing that entering Hardrick's residence without a warrant was necessary to "avoid serious injury either of police officers themselves or of others."  *Williams*, 354 F.3d at 505. Indeed, despite Hardrick's testimony that "witnesses on the block" purportedly told him that "Mama wasn't vicious and that she didn't attack anybody", (Hardrick Dep. Tr. 56:13-14), the fact remains that she was openly exploiting a broken window in an unsecured house. This, without more, indicates that there likely would have been "real immediate and serious consequences" if DAC had postponed entering Hardrick's residence.  *Williams*, 354 F.3d at 503. And that is enough; "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke [this] exception." *Michigan v. Fisher*, 558 U.S. 45, 130 S.Ct. 546, 549, 175 L.Ed.2d 410 (2009).

While in the house securing Mama, DAC encountered "Puppy" who was "locked in [a] crate in the basement and another pitbull ("Rocky") [who] was in the yard on a short chain in the mud without food or water . . . . Neither Puppy nor Rocky were being properly cared for, and Puppy would [have] likely starved without Mama to nurse it." (Jackson Aff. ¶ 10).  Several courts have recognized that the "risk of danger exigency" applies to the life

24

and health of animals. *See Shapiro v. City of Glen Cove*, 236 Fed. Appx. 645, 646 (2nd Cir. 2007) ("The undisputed information available to the officers at the time, however-that on a cold day several dogs had been seen and heard barking inside an uninhabited, dirty, partially renovated house that lacked electricity and heat-suggested that the dogs were in urgent need of assistance",thus permitting a warrantless search and seizure); *Leathem v. United States*, 1997 WL 547958 (9th Cir. 1997) (the exigent circumstances exception permitted immediate action to save the animals from severe illness and death as a result of lack of care and nutrition); *Mills v. Rodabaugh*, No. 08-14291, 2009 WL 5171846, at *6 (E.D. Mich. Dec. 22, 2009) ("the officers could have lawfully seized the dogs even without a warrant pursuant to the exigent circumstances exception to the Fourth Amendment's warrant requirement.").  In light of the uncontroverted representations in Officer Jackson's affidavit, the Court further finds that DAC's temporary seizure of Puppy and Rocky was likewise objectively reasonable under the circumstances. *See Schulz v. Gendregske*, 544 F. App'x 620, 624 (6th Cir. 2013) ("There is no clearly established law that prohibits an officer from seizing all of an individual's animals where there is evidence that many of the animals were severely mistreated.").

For those reasons, the Court GRANTS Defendants' motion for summary judgment with respect to the Fourth Amendment claims pled in Count 1 of Plaintiffs' Second Amended Complaint.

### B. Fourteenth Amendment

In their second §1983 clam, Plaintiffs maintain that Defendants' violated their Fourteenth Amendment right to procedural due process by "denying them a meaningful review of the City's deprivation at a meaningful time." (Plfs.' Resp. 20).

25

A procedural due process claim under Section 1983 requires a two-step analysis: first, the Court must determine whether there exists a liberty or a property interest which has been interfered with by one who acted under color of state law; and second, the Court must determine whether the procedures accompanying that deprivation were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).   It is undisputed that Plaintiffs had a protected property interest in their dogs and that they were temporarily deprived of that interest.   The only element of the claim that remains is whether, given the property interest at stake, Plaintiffs were afforded the procedural process that they were due. While Plaintiffs' argument is admittedly difficult to follow, it appears as though they are asserting two distinct challenges; namely, that (1) "there were no exigencies that altered the usual requirement for pre-deprivation hearings", and (2) "Plaintiffs were never issued tickets and had no post-deprivation opportunity to contest the seizure."  (Plfs.' Resp. 28).

The Fourteenth Amendment "operates on a sliding scale." *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 133 (6th Cir. 2014). For that reason, a pre-deprivation hearing is "not constitutionally required where some valid governmental interest is at stake that justifies postponing the hearing until after [the deprivation]." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994).  Such interests include "[p]rotection of the health and safety of the public[,]" which is "a paramount governmental interest." *Hodel v. Virginia Surface Mining and Reclam. Ass'n, Inc.*, 452 U.S. 264, 299 (1981). "Indeed, deprivation of property to protect the public health and safety is one of the oldest examples of permissible summary action." *Id.*

26

As discussed, the vast majority of Plaintiffs' dogs were found unrestrained, unlicensed, abandoned by their owner, or accused of biting another animal or human. Under these circumstances, Defendants' interest in protecting the public was far greater than any pre-seizure due process owed to Plaintiffs. *See Wall v. City of Brookfield*, 406 F.3d 458, 460 (7th Cir. 2005) ("The Doberman was seized without notice and an opportunity for a pre-seizure hearing- necessarily so, since the dog was picked up in the street."). And, as a practical matter, it's entirely unclear whether there would haven been any utility in conducting a pre-deprivation hearing in any case. As Defendants point out, Plaintiffs' dogs were either (1) immediately released upon the payment of vaccination and licensing fees, (2) subject to a mandatory ten-day rabies hold, or (3) cited for being "vicious" and held pending a judicial determination. In other words, any pre-seizure process would have been likely been pro forma.

Nor does Plaintiffs' post-deprivation due process claim fare any better. "The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This general principle is well-established, but "there are no bright-line rules regarding how such notice must be given or how many details it must include. Rather, the sufficiency of notice requires a fact-based analysis that seeks to determine whether the notice is 'reasonably calculated to inform the Plaintiffs of the allegations against them and provide[ ] a means for responding to the allegations.'" *Gardner v. Evans*, 811 F.3d 843, 847 (6th Cir. 2016) (citations omitted). In the context of dog seizures, the Seventh Circuit has noted that "temporary deprivation" requires "only modest process . . . ." *Wall*, 406 F.3d 458, 460.

27

Relying principally on *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 727 (6th Cir. 2011), Plaintiffs argue that they "had no ability to contest the seizure of their dogs", resulting in a complete denial of post-deprivation process. (Plfs.' Resp. 28). But *O'Neill* is distinguishable in a number of important respects. First, the defendants "intruded into the O'Neills' home without a warrant and without consent, neutered and spayed the adult dogs and implanted microchips in all nine animals . . . all without any formal charges ever being lodged . . . ." *Id.* at 726. In other words, the search precipitating the plaintiffs' due process claim was held contrary to the Fourth Amendment, and the animals were permanently altered before any charges were filed. Moreover, the local ordinance specifically implied "that a citation [was] required to impound the puppies, but none was in fact issued." *Id.* at 733. In the end, it was this "confluence of questionable circumstances" that led the court to conclude that the O'Neills "adequately pleaded a procedural due process violation." *Id.* at 734.

Here, by contrast, the search culminating in the seizure of Plaintiffs' pets has been deemed constitutional and, with the exception of so-called "vicious" dogs, the Animal Control Ordinance is silent on citation protocol. More to the point, the vast majority of Plaintiffs opted to pay the fees necessary to secure the release of their pets. If they refused, DAC–as in the case of Plaintiff Joseph Link–would have issued a written citation contestable in state court. In the end, the "taking of [a dog] by a duly authorized official, where the owner knew who was seizing the dog, where the dog was to be confined, and when the seizure was temporary[,] does not . . . raise a constitutional violation." *Skinner*, 326 F.Supp.2d at 434. Under these circumstances, there was simply no "meaningful interference" with a property interest deserving of any greater constitutional protection.

28

### C. State Law Claims

In Counts 2 and 3 of the amended complaint, Plaintiffs assert state law claims of gross negligence and intentional infliction of emotional distress, respectively. It is well settled that the Court may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it possessed original jurisdiction. *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir.1997). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state law claims should generally be dismissed as well. *Id.* The Court thus declines to assert supplemental jurisdiction over Plaintiffs' state law claims.

### D. Permanent Injunction

As discussed, on February 22, 2016, this Court granted Plaintiffs' request for a preliminary injunction, prohibiting Defendants from relying on Section 6-1-2(e) of the Animal Control Act. Plaintiffs now move for a permanent injunction, arguing that the City has not appealed or amended the operative section of the ordinance, and there are no "factual issue[s] [left] to be resolved." (Plfs.' Mot. Summ. J. 33). The City, for its part, "does not object to making the preliminary injunction permanent." (Defs.' Resp. 24). In light of the Defendants' agreement, Plaintiffs' request to convert the preliminary injunction to a permanent injunction is GRANTED. Accordingly, for the reasons stated in the Court's February 22, 2016 Opinion and Order (Dkt. 26), the Court permanently enjoins Defendants from relying on or acting pursuant to Section 6-1-2(e).

## IV. Conclusion

For the reasons thus stated, the Court hereby ORDERS as follows:

29

- Defendants' motion for summary judgment [54] is GRANTED with respect to Count 1 only;

- Plaintiffs' motion for partial summary judgment [55] is GRANTED with respect to Count 2 only;

- Defendants are permanently enjoined from relying on Section 6-1-2(e) of the Animal Control Code;

- Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE.

The Order closes the case in its entirety.


SO ORDERED.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  November 8, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 8, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel_____
Case Manager